**ADELBERT M. BRYAN, Appellant/Petitioner**

**v.**

**CAROLINE F. FAWKES, in her Official Capacity as Supervisor of
Elections and V.I. Joint Board of Elections,
Appellees/Respondents, ALICIA "CHUCKY" HANSEN,
Appellee/Intervenor**

S. Ct. Civil No. 2014-0066

Supreme Court of the Virgin Islands

October 24, 2014

416

417

418

423

EMILE A. HENDERSON III, ESQ., Law Offices of Yvette D. Ross-Edwards, St. Croix, USVI, *Attorney for Appellant.*

KIMBERLY L. SALISBURY, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellees Caroline F. Fawkes and V.I. Joint Board of Elections.*

LEE J. ROHN, ESQ., Law Offices of Lee J. Rohn & Associates LLC, St. Croix, USVI, *Attorney for Appellee Alicia "Chucky" Hansen.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice*.

## OPINION OF THE COURT

(October 24, 2014)

HODGE, *Chief Justice*. Appellant Adelbert Bryan appeals from the Superior Court's October 10, 2014 order, which denied his motion to enforce its August 29, 2014 order implementing this Court's August 28, 2014 opinion disqualifying Alicia "Chucky" Hansen from the general election ballot for membership in the 31st Legislature, and to hold the Supervisor of Elections — Caroline Fawkes — in contempt for her failure to comply with that order. For the reasons that follow, we reverse the Superior Court's October 10, 2014 order, once again order Fawkes to immediately remove Hansen's name from the general election ballot for

the November 4, 2014 general election, and remand the case to the Superior Court so that it shall issue the factual findings and conclusions of law necessary to determine whether Fawkes should be held in contempt or otherwise sanctioned for her non-compliance with the orders entered by this Court and the Superior Court.

## I. BACKGROUND

Because many of the facts of this case were set forth in this Court's prior August 28, 2014 opinion, *see Bryan v. Fawkes (Bryan I)*, 61 V.I. 201 (V.I. 2014), we summarize only the relevant events that occurred after that opinion's issuance. In an August 29, 2014 order issued on remand, the Superior Court granted Bryan's petition to set aside Hansen's May 2014 nomination papers, and "ORDERED that the Supervisor of Elections shall set aside the nomination papers of Alicia 'Chucky' Hansen, and remove the name of Alicia 'Chucky' Hansen from the general election ballot." *Bryan v. Fawkes*, Super. Ct. Civ. No. 144/2014 (STX), slip op. at 1 (V.I. Super. Ct. Aug. 29, 2014). On September 2, 2014, Fawkes, by written notice in response to a letter from Hansen, advised Hansen that she would comply with the Superior Court's August 29, 2014 order and remove her name from the ballot.

On September 3, 2014, the Governor of the Virgin Islands pardoned Hansen of her three convictions for willful failure to file an income tax return in violation of title 33, section 1524 of the Virgin Islands Code. The next day, Hansen attempted to "cure" the defect that led to her removal from the general election ballot by submitting "new" nomination papers. Fawkes, however, declined to place Hansen on the ballot because this Court's August 28, 2014 opinion and the Superior Court's August 29, 2014 order both remained in effect.

On September 7, 2014, five Virgin Islands voters sued Fawkes and the Virgin Islands Joint Board of Elections in the District Court of the Virgin Islands. The next day, Hansen filed a virtually identical complaint against Fawkes, also in the District Court. Hansen and the voters moved for a temporary restraining order, a preliminary injunction, a permanent injunction, and for declaratory relief, primarily on the theory that the Governor's pardon retroactively erased the impediment to Hansen serving in the 31st Legislature that resulted in her May 2014 nomination papers being set aside. In the alternative, they argued that Fawkes's refusal to place Hansen on the ballot would purportedly violate the First, Fifth, and

Fourteenth Amendments to the United States Constitution. In their respective complaints, they contended that the District Court possessed subject matter jurisdiction to adjudicate this issue because the Revised Organic Act of 1954 — despite being the *de facto* constitution for the Virgin Islands — is a federal statute, as well as under 28 U.S.C. § 1343 and 42 U.S.C. § 1983. Neither complaint requested that the District Court exercise supplemental jurisdiction to resolve any issues of local Virgin Islands law.

The District Court consolidated the complaints filed by Hansen and the five voters, and heard oral argument on the motion for a temporary restraining order on September 10, 2014. At oral argument, Fawkes, rather than defend her decision to comply with the Superior Court's August 29, 2014 order, stated that she fully agreed with all of the legal arguments raised by Hansen and the voters, and requested that the District Court issue a temporary restraining order directing her to reinstate Hansen's name on the ballot. Despite having filed the Superior Court petition that resulted in Hansen being removed from the ballot, Bryan was not named as a defendant by either party to the District Court complaints,[1] was not joined as a necessary party or the real party in interest, and did not otherwise participate in the proceedings. At the conclusion of the hearing, the District Court ordered Hansen, the five voters, and Fawkes to submit supplemental briefs on two issues: (1) the retroactive effect of the Governor's pardon, and (2) whether local Virgin Islands law provides Hansen with an opportunity to cure.

At 3:39 p.m. on September 11, 2014, Fawkes filed a petition for rehearing with this Court, as allowed pursuant to this Court's Rules of Appellate Procedure. *See* V.I.S.CT.R. 31(a) ("A petition for rehearing may be filed within 14 days after entry of judgment."). In her petition, Fawkes raised many of the same arguments that she, Hansen, and the voters all raised as part of the District Court proceeding, but also raised the issue of local law upon which the District Court ordered supplemental briefing. Specifically, Fawkes alleged that this Court's decision to order the Superior Court to set aside Hansen's nomination papers "was premature since the defect was curable by pardon from the Governor restoring [her]

---

[1] Although a member of the Joint Board of Elections by virtue of his membership on the St. Croix District Board of Elections, the complaints filed by Hansen and the five voters did not identify Bryan as a defendant, but only the Joint Board.

civil rights." (Pet. 2.) Later that same afternoon, Hansen and the voters filed a copy of Fawkes's rehearing petition with the District Court.

Despite being expressly informed by Hansen and the voters that the same issues were being considered by this Court as part of the same proceeding that had resulted in issuance of the August 28, 2014 opinion, the District Court issued a temporary restraining order on the morning of September 12, 2014. *Payne v. Fawkes* (*Payne I*), Civ. Nos. 2014-053, 055, 2014 U.S. Dist. LEXIS 127697, *3 (D.V.I. Sept. 12, 2014) (unpublished). In that opinion, the District Court first determined that it "has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 — federal question jurisdiction — because Plaintiffs allege that Defendants' refusal to put Senator Hansen's name on the November 4, 2014 general election ballot violates the Revised Organic Act of 1954, 48 U.S.C. §§ 1541-1645, and the United States Constitution," as well as "pursuant to 28 U.S.C. § 1343 — jurisdiction over civil rights actions — because Plaintiffs have alleged that Defendants' actions have deprived them of their civil rights pursuant to 42 U.S.C. § 1983." *Id.*, 2014 U.S. Dist. LEXIS 127697 at *8.

As to the merits, the District Court expressly rejected the primary argument advanced by Hansen, the five voters, and Fawkes, and concluded that the Governor's pardon did not retroactively render her May 2014 nomination papers valid. *Id.* 2014 U.S. Dist. LEXIS 127697 at *14. Specifically, the District Court relied on a holding of the United States Supreme Court that a pardon "does not make amends for the past" and "affords no relief for what has been suffered by the offender" prior to the pardon. *Id.* 2014 U.S. Dist. LEXIS 127697 at *13 (quoting *Knote v. United States*, 95 U.S. 149, 153-54, 24 L. Ed. 442, 13 Ct. Cl. 517 (1877)).

Nevertheless, the District Court concluded that a temporary restraining order should issue. Although neither Hansen nor the voters had pleaded any territorial law claims in their complaint, nor requested that the District Court exercise supplemental jurisdiction under 28 U.S.C. § 1367, the District Court, having ordered briefing on the territorial law issue *sua sponte*, elected to issue a temporary restraining order based solely on its interpretation of territorial law. The District Court recognized that the United States Court of Appeals for the Third Circuit has instructed it that "when exercising jurisdiction over cases requiring the application of Virgin Islands law," it "[is] required to predict how the Supreme Court of the Virgin Islands would decide an issue of territorial law." *Id.* 2014 U.S.

428

Dist. LEXIS 127697 at *21 (quoting *Edwards v. HOVENSA, LLC*, 497 F.3d 355, 362 n.3, 49 V.I. 1133 (3d Cir. 2007)). Despite being fully aware that the issue of Hansen's ability to cure under Virgin Islands law was being actively litigated before this Court as part of the same proceeding that resulted in Hansen's removal from the ballot — and thus likely to result in a definitive determination of that question in the very near future — the District Court undertook to resolve that very question without waiting for resolution of the rehearing petition. Although recognizing in a footnote that 18 V.I.C. § 412 — the statute that Bryan invoked to challenge Hansen's nomination papers — vested the right to amend nomination papers after they are set aside in the sound discretion of the Superior Court, *id.*, 2014 U.S. Dist. LEXIS 127697 at *24 n.11, the District Court implicitly concluded that this Court would adopt the position taken by the Attorney General of the Virgin Islands in an advisory letter to the Governor, in which he concluded that 18 V.I.C. § 411(c) provided Hansen with an absolute right to resubmit her nomination papers within three days of being advised of the defect by Fawkes. *Id.*, 2014 U.S. Dist. LEXIS 127697 at *20. Even though it had stressed that it possessed subject matter jurisdiction because of Hansen and the five voters' federal constitutional claims, the District Court emphasized that it was basing its decision to issue a temporary restraining order exclusively on its prediction of how this Court would interpret local Virgin Islands law, and that it therefore "need not reach Plaintiffs' constitutional arguments." *Id.* 2014 U.S. Dist. LEXIS 127697 at *25 n.12. At no point did the District Court's September 12, 2014 order explain the source of its jurisdiction for issuing a temporary restraining order based solely on a prediction of how this Court would interpret a Virgin Islands statute, or its authority to resolve an issue of Virgin Islands law *sua sponte* when it had not been pled in the initial complaints. Nor did the September 12, 2014 order state whether the District Court was exercising *in personam* or *in rem* jurisdiction over the matter.

Later that same day, this Court ruled on Fawkes's rehearing petition. In our September 12, 2014 order, this Court noted that virtually all of the arguments Fawkes made in her rehearing petition were waived since they could have been — but were not — raised in her appellate brief, and were instead being raised for the first time in her rehearing petition. *Bryan v. Fawkes (Bryan II)*, S. Ct. Civ. No. 2014-0046, slip op. at 2 (V.I. Sept. 12, 2014) (unpublished) (citing *Rivera v. People*, S. Ct. Crim. No. 2008-0052,

2009 V.I. Supreme LEXIS 29, *5 (V.I. Apr. 14, 2009) (unpublished) (collecting cases)). However, this Court addressed, on the merits, Fawkes's claim that this Court acted prematurely when it ordered her to set aside Hansen's nomination papers:

> While Fawkes cites to several cases from other jurisdictions standing for the proposition that a candidate's qualifications at the time he or she is administered the oath of office, rather than on the date of the election, control whether the candidate is eligible to hold that office, those cases are inapposite because this case arose pursuant to a proceeding initiated under 18 V.I.C. § 412, a statute authorizing judicial review of the decision of the Supervisor of Elections to place a candidate on the ballot. That statute contains a specific provision relating to the ability to cure a nomination paper that has been challenged in a judicial proceeding:
>
> > If the court finds that the nomination petition or paper is defective under the provisions of section 411 of this title, or that it does not contain a sufficient number of signatures of electors entitled to sign it under the provisions of this chapter, or was not filed by persons entitled to file it, it shall be set aside. If the objections relate to material errors or defects apparent on the face of the nomination petition or paper, or on the face of the accompanying or appended affidavits, the court, after hearing, *may, in its discretion*, permit amendments within such time and upon such terms as to payment of costs, as the court may specify.
>
> 18 V.I.C. § 412 (emphasis added). Thus, section 412 clearly contemplates that candidates whose nomination papers have been challenged in the courts do not have an automatic right to cure the defect. Notably, Hansen never requested that this Court or the Superior Court grant her time to cure in the event she was found ineligible for nomination to the 31st Legislature.

Hansen was not eligible to be nominated for membership in the 31st Legislature when she filed her nomination papers on May 13, 2014, due to her convictions for crimes involving moral turpitude. Nor was she eligible on August 28, 2014, when this Court issued its opinion reversing the Superior Court's July 30, 2014 order, or on August 29, 2014, when the Superior Court, on remand, ordered her removal from

the ballot. While the Superior Court, in its discretion, could have arguably provided Hansen with a date certain by which to obtain a pardon, at no point did Fawkes or Hansen request that it exercise that discretion. After the Superior Court granted Hansen permission to intervene, Hansen filed a motion to dismiss; at no point did she request, in the alternative, that the Superior Court provide her with an opportunity to cure the defect alleged in Bryan's petition. Similarly, although the matter had been pending before the Superior Court for approximately three months, Fawkes never requested that the Superior Court exercise its discretion under section 412 to provide Hansen with an opportunity to cure.

Of even more relevance to the rehearing petition, on appeal to this Court, neither Hansen nor Fawkes ever requested, either in their appellate briefs or even during oral argument, that this Court — were it to rule in Bryan's favor — order the Superior Court to refrain from setting aside Hansen's nomination papers until she had the opportunity to seek a pardon from the Governor. Rather, both Hansen and Fawkes premised their entire litigation strategy — both at the trial level and on appeal — on convincing the Superior Court and this Court to either refrain from resolving Bryan's petition on the merits, or to sustain Fawkes's determination that Hansen's convictions were not for crimes involving moral turpitude. Despite being clearly aware of section 412's existence, neither Fawkes nor Hansen requested that either the Superior Court or this Court grant leave to amend under that section. Thus, Fawkes cannot argue, for the very first time in her petition for rehearing, that this Court should have *sua sponte* mandated the Superior Court to grant leave to cure when, pursuant to statute, such leave is discretionary rather than mandatory. *Rivera*, 2009 V.I. Supreme LEXIS 29, at *3. In other words, like the other issues addressed in her rehearing petition, Fawkes could have — but did not — raise the issue of amendment or opportunity to cure in her appellate brief, but for whatever reason did not do so.

*Bryan II*, slip op. at 2-5 (footnotes omitted). In a footnote, this Court acknowledged the existence of 18 V.I.C. § 411(c), but explained that it was a different provision in the Virgin Islands Code relating to when a nomination paper is rejected by the Supervisor of Elections, rather than set aside by a court. *Id.* at 3 n.2. And in a separate footnote, this Court questioned whether

section 412 even authorized the Superior Court to provide Hansen with an opportunity to cure, "[g]iven that Bryan's objection in this case related to Hansen's eligibility to run given her convictions for crimes involving moral turpitude," and thus "it is not clear whether the defect in this case could be characterized as a defect with the nomination paper itself." *Id.* at 4 n.3.

Although faced with two contradictory orders — the August 29, 2014 Superior Court order directing Hansen's removal from the ballot, and the September 12, 2014 District Court order directing Hansen's placement on the ballot — Fawkes chose to comply with the District Court order, and on September 15, 2014, the St. Croix District Board of Elections, by a divided 4-2 vote, approved Fawkes's addition of Hansen to the ballot. On September 18, 2014, Bryan — who we again note was not a party to the District Court action — filed, with the Superior Court, an "Emergency Motion for Enforcement of Judgment and for Contempt Sanctions." In his motion, Bryan argued that both this Court's August 28, 2014 opinion and the Superior Court's August 29, 2014 order remained valid and enforceable, and that the conflict between the District Court's September 12, 2014 temporary restraining order and this Court's September 12, 2014 order denying rehearing should be resolved in favor of this Court's order. Bryan further alleged that Fawkes and Hansen — the losing parties in *Bryan I* — colluded to bypass the adversarial litigation in the Virgin Islands court system — which was, and to this day remains, pending — through a non-adversarial District Court proceeding.

The Superior Court set Bryan's motion for a hearing on September 24, 2014. However, the day before the hearing, Hansen filed a "Notice of Removal" with the District Court, which alleged that Bryan's enforcement motion was removable pursuant to 28 U.S.C. § 1441(a) because it purportedly presented a substantial federal question. As a result of Hansen's filing, the Superior Court cancelled the scheduled hearing.

On the morning of September 24, 2014 — the same day the Superior Court had originally planned to hold its hearing on Bryan's motion to enforce the Superior Court's August 29, 2014 order — the District Court converted its temporary restraining order into a permanent injunction. *Payne v. Fawkes* (*Payne II*), Civ. Nos. 2014-053, 055, 2014 U.S. Dist. LEXIS 134451, *4 (D.V.I. Sept. 24, 2014) (unpublished). The District Court granted a permanent injunction for largely the same reasons as it had granted the temporary restraining order. The key difference between the two orders, however, is that the September 24, 2014 order

acknowledged this Court's September 12, 2014 order denying Fawkes's petition to have *Bryan I* reheard. Even though this Court's September 12, 2014 order identified 18 V.I.C. § 412, and not 18 V.I.C. § 411(c), as the controlling provision with respect to Hansen's right — if any — to cure, and expressly concluded that Hansen was not entitled to cure because she failed to request such relief from either this Court or the Superior Court, the District Court reasoned that our decision did not change its analysis because our September 12, 2014 order was designated as "Not for Publication" and, if followed, would purportedly create an "inequitable" result and require the District Court to conduct a "difficult analysis" of Hansen's federal constitutional claims. *Payne II*, 2014 U.S. Dist. LEXIS 134451, at *38-47.

Later that week, on September 26, 2014, Bryan filed a motion for the District Court to remand his enforcement motion back to the Superior Court, on the grounds that Hansen's removal notice was untimely and that, in any event, the District Court lacked federal question jurisdiction over the matter and did not possess the authority to enforce or decline to enforce a valid Superior Court order. The matter was assigned to the same District Court judge who presided over the *Payne* matter and issued the temporary restraining order and permanent injunction.

In an October 1, 2014 opinion and order, the District Court granted Bryan's motion and remanded the matter to the Superior Court. *Bryan v. Fawkes (Bryan III)*, Civ. No. 2014-066, 2014 U.S. Dist. LEXIS 139025, *1 (D.V.I. Oct. 1, 2014) (unpublished). Despite the fact that the District Court had now issued a permanent injunction that directed Fawkes to do the exact opposite of what the Superior Court had ordered her to do through its August 29, 2014 order,[2] the District Court expressed some

---

[2] In its *Bryan III* opinion, the District Court noted that it was "unclear" whether the Joint Board of Elections had been a party to the proceedings in this Court and the Superior Court, or if Fawkes had been the only respondent. Nevertheless, the District Court proceeded as if the Joint Board of Elections had been a party "because the Joint Boards were included in the caption of Senator Hansen's 'Notice of Removal,' as well as in the filings that have followed." 2014 U.S. Dist. LEXIS 139025 at *6 n.2. We take this opportunity to clarify that the Joint Board of Elections was, indeed, a party to all the relevant proceedings in the Superior Court and this Court, but its status as a party had not been reflected in this Court's caption in *Bryan I* because it is the practice of this Court to base its caption on the Superior Court's caption, *see* V.I.S.Cт.R. 5(f), which in this case was based on the caption Bryan self-styled in his section 412 petition, which had been initially filed *pro se* and only included Fawkes in the caption. However, it is clear that, at all times, all of the parties to this matter understood

surprise at Hansen's decision to attempt to remove the matter because it seemed "intuitive that the Superior Court, not [the District] Court, should determine whether the Superior Court's August 29, 2014 Order from the pre-pardon action should be enforced." *Bryan III*, 2014 U.S. Dist. LEXIS 139025, at *12-13. Additionally, although it had, in the *Payne* decisions, ordered Fawkes to place Hansen on the general election ballot, the District Court, for the first time, recognized a distinction between access to the ballot and eligibility to serve as a member of the Legislature if elected, and acknowledged that the Governor's pardon may have restored Hansen's eligibility to serve if elected while not simultaneously requiring her reinstatement to the ballot. *Id.* 2014 U.S. Dist. LEXIS 139025 at *14-21.

The same day that the District Court issued its October 1, 2014 opinion in *Bryan III*, Hansen and the five voters filed an emergency motion in the *Payne* case, which requested that the District Court enjoin any Superior Court proceedings on Bryan's enforcement motion. In their motion, Hansen and the voters took the position that "[t]his is effectively an *in rem* proceeding where the conduct of one public official is at issue" which required emergency injunctive relief to prevent inconsistent adjudications.

The District Court, in an October 6, 2014 opinion, denied this emergency motion. *Payne v. Fawkes* (*Payne III*), Civ. Nos. 2014-053, 055, 2014 WL 4979449, at *1 (D.V.I. Oct. 6, 2014) (unpublished). It reasoned that the federal Anti-Injunction Act, 28 U.S.C. § 2283, which prohibits federal district courts from enjoining proceedings in state courts except as authorized by Congress or in necessary aid of its jurisdiction or to protect or effectuate its judgments, precluded it from interfering with the Superior Court proceedings. Moreover, it noted that "the issues in the federal and state court proceedings were completely different," in that Bryan initiated his Superior Court complaint prior to the Governor's

---

that Bryan sought relief not only against Fawkes, but against the Joint Board, since the August 6, 2014 notice of appearance filed by the Office of the Attorney General in *Bryan I* stated that the Attorney General was entering an "appearance for the Supervisor of Elections and the Joint Board of Elections in the above-captioned matter," and many of the parties briefs and other filings — including Bryan's notice of appeal — reflect that the Joint Board was, and remains, a party to this matter. To ease confusion, all references to Fawkes in this opinion, unless context requires otherwise, should be considered a reference to both Fawkes and the Joint Board.

pardon while Hansen and the five voters initiated their District Court action after the Governor issued his pardon. *Id.* at *6. But notwithstanding its decision to allow the Superior Court proceedings to continue, the District Court stated that it "fully stands behind its ruling" that "Hansen . . . must be placed on the ballot." *Id.* at *7.

The Superior Court finally held its hearing on Bryan's enforcement motion on October 7, 2014. Although Bryan's motion made many factual allegations regarding potential collusion between Hansen and Fawkes as to the procurement of the District Court temporary restraining order and injunction, the Superior Court did not conduct an evidentiary hearing on this issue, even though the District Court, through its October 1, 2014 opinion in *Bryan III*, implied that it could conduct such an inquiry. Instead, the Superior Court only heard oral arguments as to whether Hansen possessed an automatic right to cure, and the relationship between the District Court orders and the earlier orders issued by the local courts. At the conclusion of the hearing, the Superior Court authorized the parties to file supplemental briefs on whatever issues they desired, which both Hansen and Bryan did on October 8, 2014.[3]

The Superior Court issued an order denying the motion on October 10, 2014. In that order, the Superior Court first declined to hold Fawkes in contempt, reasoning that the District Court's September 12, 2014 temporary restraining order "completely changed the circumstances" and, in effect, excused Fawkes's non-compliance with this Court's August 28, 2014 opinion and the Superior Court's August 29, 2014 order. With respect to Bryan's request that it enforce the August 29, 2014 order, the Superior Court, like the District Court, concluded that 18 V.I.C. § 411(c) applied to the matter, and that Hansen therefore had an opportunity to cure. In a footnote, the Superior Court admonished Bryan for attempting to collaterally attack the District Court orders through his motion, and dismissed his reliance on this Court's September 12, 2014 order denying rehearing because "the Supreme Court did not reach the issue of whether Hansen was entitled to a mandatory three day right to cure from Fawkes under § 411(b) and (c)." *Bryan v. Fawkes* (*Bryan IV*), Super. Ct. Civ. No. 144/2014 (STX), slip op. at 10 n.12 (V.I. Super. Ct. Oct. 10, 2014) (unpublished). Although specifically asked to do so, the Superior Court

---

[3] On the same day, Fawkes filed a "Notice of Joinder" with the Superior Court stating that she fully joined in the supplemental brief submitted by Hansen.

made no factual findings as to whether any collusion occurred between Hansen and Fawkes with respect to procurement of the pertinent District Court orders.

Bryan timely filed a notice of appeal with this Court on October 15, 2014. On October 18, 2014, Bryan filed a motion requesting that this Court take summary action or grant expedited review of his appeal, given that the general election was less than two weeks away. This Court, in an October 20, 2014 expedited scheduling order, granted Bryan's motion, ordered expedited transmission of the Superior Court record, and directed that Bryan file a letter-form brief no later than 4:00 pm on October 21, 2014, and that Fawkes and Hansen each file a letter-form brief no later than 4:00 pm on October 22, 2014. The Clerk of the Superior Court, as well as the parties, all complied with these expedited deadlines.

## II. JURISDICTION

This Court possesses jurisdiction over this appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which vests us with jurisdiction over "all appeals arising from final judgments, final decrees, [and] final orders of the Superior Court." *See also* 48 U.S.C. § 1613a ("Upon the establishment of the appellate court provided for in section 1611(a) of this title all appeals from the decisions of the courts of the Virgin Islands established by local law not previously taken must be taken to that appellate court."). Additionally, this Court may exercise jurisdiction pursuant to its statutory and inherent power to enforce its August 28, 2014 opinion, which directed the Superior Court to issue its August 29, 2014 order setting aside Hansen's nomination papers and directing Fawkes to remove her name from the ballot. *See* 4 V.I.C. § 32(b) ("The Supreme Court shall have all inherent powers, including the power to issue all writs necessary to the complete exercise of its duties and jurisdiction under the laws of the Virgin Islands."); 4 V.I.C. § 243(4) ("Every court shall have power . . . [t]o compel obedience to its judgments, orders, and process, and to the orders of a judge out of court, in all actions, or proceedings pending therein."); 4 V.I.C. § 281 ("Every judicial officer shall have power . . . [t]o compel obedience to his lawful orders."); *In re Burke*, 50 V.I. 346, 350-51 (V.I. 2008).

## III. DISCUSSION

As the summary of the lengthy history of this procedurally-complex appeal illustrates, the disposition of this appeal rests primarily on the

relationship between the opinions and orders of the Virgin Islands courts entered on August 28, 2014, August 29, 2014, and September 12, 2014, and the opinions and orders of the federal District Court entered on September 12, 2014, September 24, 2014, and October 6, 2014. For the reasons that follow, we conclude that the District Court lacked subject matter jurisdiction to interfere with an *in rem* proceeding that remained actively litigated in the Virgin Islands court system, and that even if it possessed *in personam* jurisdiction, conflicts between Virgin Islands courts and the District Court on issues of Virgin Islands law must necessarily be resolved in favor of the local courts. We also conclude Bryan is entitled to enforcement of the orders entered by this Court and the Superior Court, and to have the Superior Court issue factual findings and conclusions of law as to whether Fawkes should be sanctioned for her failure to comply with those orders.

## A. The District Court Orders

Beginning with his September 18, 2014 motion and continuing through this appeal, Bryan has maintained that the District Court's various orders in the *Payne* litigation do not provide a bar to enforcing the Superior Court's August 29, 2014 order entered on remand from this Court's August 28, 2014 opinion, notwithstanding the fact that the District Court's September 12, 2014 temporary restraining order and September 24, 2014 permanent injunction each order Fawkes to do precisely the opposite of what this Court's August 28, 2014 opinion and the Superior Court's August 29, 2014 order directed her to do. Fawkes and Hansen, in their filings in both the District Court proceedings and before the Virgin Islands courts, have maintained that both this Court and the Superior Court lack the power to question the validity of the District Court orders.

■ We disagree with Fawkes and Hansen that this Court is wholly without authority to examine the District Court orders. Although Fawkes and Hansen have maintained that the Supremacy Clause of the United States Constitution[4] compels this Court and the Superior Court to defer to

---

[4] "This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." U.S. CONST. art. VI, cl. 2.

decisions of the District Court, we note that the District Court is not an Article III court; rather, it is an Article IV court, just like this Court and the Superior Court. *See United States v. Gillette*, 738 F.3d 63, 70, 60 V.I. 855 (3d Cir. 2013) ("The District Court of the Virgin Islands derives its jurisdiction from Article IV, § 3 of the United States Constitution, which authorizes Congress to regulate the territories of the United States. This distinguishes it from other federal courts, whose jurisdiction is grounded in Article III." (citations omitted)); *Parrott v. Gov't of the V.I.*, 230 F.3d 615, 621, 43 V.I. 277 (3d Cir. 2000) (identifying both the District Court and the Territorial — now Superior — Court as Article IV courts); *Oveson v. Gov't of the V.I.*, D.C. Civ. App. 2006-0120, 2011 U.S. Dist. LEXIS 45540, *6 n.5 (D.V.I. App. Div. Apr. 26, 2011) (unpublished) ("[B]oth the [Superior Court] and the District Court derive their respective jurisdictional grants from the same[ ] sovereign — namely, Congress, exercising its authority under Article IV."). Thus "the Supremacy Clause has no direct role in a conflict between federal law and territorial law," for a conflict between this Court (or the Superior Court) and the District Court "presents no competition between state and federal sovereignty," given that all of the courts involved draw their sovereignty from Congress under Article IV.[5] *Lewis v. Alexander*, 685 F.3d 325, 346 n.18 (3d Cir. 2012).

█ While the Supremacy Clause is wholly irrelevant to this case because all courts involved are Article IV courts, we must nevertheless determine whether Congress, through other legislation, intended for this

---

[5] This is in accord with numerous decisions holding that other limitations on the power of state governments found in the United States Constitution do not apply to territorial governments, given that territorial governments exercise authority that has been delegated by Congress under Article IV. *See Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1286-87 (9th Cir. 1985) (holding dormant commerce clause not applicable to Guam because "the Government of Guam is in essence an instrumentality of the federal government."); *United States v. Husband R.*, 453 F.2d 1054, 1059-60 (5th Cir. 1971) (holding Canal Zone government is Congress's "delegate" and is not subject to commerce clause limitations); *Buscaglia v. Ballester*, 162 F.2d 805, 806-07 (1st Cir. 1947) ("The commerce clause gives Congress plenary power to regulate our foreign and interstate commerce and thus as a necessary consequence it has the secondary effect of a restriction upon the power of the states in the premises. It thus has two aspects, but in neither of them either as a grant of federal power or as a necessarily consequential limitation upon state power, does it affect Puerto Rico."); see also Anthony Ciolli, *The Power of United States Territories to Tax Interstate and Foreign Commerce: Why the Commerce and Import-Export Clauses Do Not Apply*, 63 TAX LAW. 1223, 1246-47 (2010).

Court and the Superior Court to be bound by a decision of the District Court. As we have previously held, Congress clearly intended for administrative separation between the Superior Court and the District Court, with the Superior Court, for most purposes, treated as a state court, and the District Court — again, for most, but not all purposes — treated as a federal court. *In re Admission of Alvis*, 54 V.I. 408, 413 (V.I. 2010) (quoting *Parrott*, 230 F.3d at 621 & *Gov't ex rel. Robinson v. Schneider*, 893 F. Supp. 490, 495 (D.V.I. 1995)). Significantly, Congress decreed in the Revised Organic Act that "[t]he relations between [federal] courts . . . and the courts established by [Virgin Islands] law . . . shall be governed [in the same manner as] relations between [federal] courts . . . and the courts of the several States." 48 U.S.C. § 1613. "The United States Supreme Court and the Third Circuit — like virtually every other court to address this issue — agree that a state court is not required to follow the case law of federal district courts or federal courts of appeals," even with respect to issues of federal law. *Better Bldg. Maint. of the V.I., Inc. v. Lee*, 60 V.I. 740, 756 n.9 (V.I. 2014) (collecting cases); *Hughley v. Gov't of the V.I.*, 61 V.I. 323 (V.I. 2014) ("[I]t is well established that the court of last resort for a state or territory is not bound by decisions of its regional federal court of appeals or any other lower federal court — even those interpreting the United States Constitution — but need only follow the United States Supreme Court.") (collecting cases); *Johnson v. Williams*, 133 S. Ct. 1088, 1098, 185 L. Ed. 2d 105 (2013) (observing that "the views of the federal courts of appeals do not bind [a state court]"); *Surrick v. Killion*, 449 F.3d 520, 535 (3d Cir. 2006) ("[D]ecisions of the federal district courts and courts of appeals, including those of the Third Circuit Court of Appeals, are not binding on [state] courts.").[6]

---

[6] *See also State v. Montano*, 206 Ariz. 296, 77 P.3d 1246, 1247 n. 1 (2003) (Arizona Supreme Court finding it was not bound by the Ninth Circuit's interpretation of the United States Constitution); *People v. Dunlap*, 975 P.2d 723, 748 (Colo. 1999) (Colorado Supreme Court explaining it was not bound by Tenth Circuit's interpretation of federal constitutional requirements); *Stratos v. Dep't of Pub. Welfare*, 387 Mass. 312, 439 N.E.2d 778, 786 n. 8 (1982) (Supreme Judicial Court of Massachusetts finding that although the calculation of an award under [section] 1988 was governed by federal law, it was not bound to follow the method adopted by the First Circuit); *Cash Distributing Co. v. Neely*, 947 So. 2d 286, 294 (Miss. 2007) ("While this Court often defers to Fifth Circuit decisions interpreting federal law, we are under no obligation to do so."); *State v. Robinson*, 2003 MT 364, 319 Mont. 82, 82 P.3d

██ Yet while this Court and the Superior Court are not required to defer to decisions of the District Court as to questions of federal law, the pertinent provision of the Revised Organic Act has been interpreted to require the District Court to defer to this Court as to issues of Virgin Islands law. *Edwards*, 497 F.3d at 360 ("Now that [48 U.S.C.] § 1613 mandates that the relations between [federal] courts . . . and [Virgin Islands] courts . . . mirror the relations between state and federal courts, . . . § 1613 makes the *Erie* doctrine and the Rules of Decision Act applicable to the District Court of the Virgin Islands."); *see also Banks v. Int'l Rental and Leasing Corp.*, Nos. 08-1603, 08-2512, 2011 WL 7186340, at *1 (3d Cir. Apr. 19, 2011) (unpublished) (certifying question of Virgin Islands law to Virgin Islands Supreme Court). Significantly, other state courts of last resort, when confronted with an injunction issued by a lower federal court, have not hesitated to disregard such orders and conduct their own analyses of the legal questions involved, deferring only to the authority of the United States Supreme Court to ultimately resolve any conflict that results from contradictory decisions. *See, e.g., In re Contest of November 8, 2011 General Election*, 210 N.J. 29, 40 A.3d 684, 693 (2012);[7] *Puget Sound Gillnetters Ass'n v. Moos*, 88 Wn.2d 677,

---

27, 30 (2003) (Montana Supreme Court refusing to follow Ninth Circuit's interpretation of federal law, stating the Courts of Appeals "do not have appellate jurisdiction over the state courts and their decisions are not conclusive on state courts, even on questions of federal law"); *Lincoln Elec. Sys. v. Neb. Pub. Serv. Comm'n*, 265 Neb. 70, 655 N.W.2d 363, 371 (2003) (Nebraska Supreme Court noting that while state courts are bound by the United States Supreme Court's interpretation of federal law, they are not bound by circuit courts' interpretations); *State v. Gaitan*, 209 N.J. 339, 37 A.3d 1089, 1118 (2012) ("The decision[s] of the Third Circuit [are] not binding on New Jersey courts."); *Commonwealth v. Cross*, 555 Pa. 603, 726 A.2d 333, 338 n.4 (1999) (Pennsylvania Supreme Court holding that it was not bound by Third Circuit decisions interpreting United States Supreme Court jurisprudence); *Lundborg v. Keystone Shipping Co.*, 138 Wn.2d 658, 981 P.2d 854, 862-63 (1999) (Washington Supreme Court refusing to follow Ninth Circuit's interpretation of federal maritime law issue).

[7] We acknowledge that the United States District Court for the District of New Jersey, shortly after issuance of the New Jersey Supreme Court's decision rejecting its analysis, dismissed the opinion as "a scholarly discussion of this Court's prior ruling" and "an improper collateral attack on that ruling." *Robertson v. Bartels*, 890 F. Supp. 2d 519, 528 (D.N.J. 2012). The New Jersey District Court reached that decision by relying on a United States Supreme Court case holding that "where the judgment or decree of the Federal court determines a right under [federal law] . . . , that decision is 'final until reversed in an appellate court, or modified or set aside in the court of its rendition.' " *Id.* at 527 (quoting *Stoll v. Gottlieb*, 305 U.S. 165, 170, 59 S. Ct. 134, 83 L. Ed. 104 (1938)). However, as we explain in greater detail below, the

565 P.2d 1151, 1157 (1977); *State v. Norflett*, 67 N.J. 268, 337 A.2d 609, 618 (1975).

We recognize that this case differs from our prior precedents, in that two of the parties to this proceeding — Hansen and Fawkes — were also parties in the *Payne* case before the District Court, and that both proceedings involve the same subject matter, to wit, whether Hansen's name may appear on the general election ballot. We find this to be of no relevance, for it is well-established that "purported judgments entered by a court without jurisdiction over the subject matter are void and as such are subject to collateral attack." *Sierra Life Ins. Co. v. Granata*, 99 Idaho 624, 586 P.2d 1068, 1070 (1978) (citing RESTATEMENT (FIRST) OF JUDGMENTS § 7 (1942)); *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1180, 407 U.S. App. D.C. 133 (D.C. Cir. 2013) ("The [United States] Supreme Court has long instructed that judgments in excess of subject-matter jurisdiction 'are not voidable, but simply void.' " (quoting *Elliot v. Peirsol's Lessee*, 26 U.S. (1 Pet.) 328, 340, 7 L. Ed. 164 (1828))); *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 362 (2d Cir. 2000) ("[A] judgment rendered by a court lacking subject matter jurisdiction is subject to collateral attack as void.") (citing RESTATEMENT (SECOND) OF JUDGMENTS § 69 (1980)). It is true, as a general rule, that "when a judgment rendered by a federal court is collaterally attacked in a state tribunal, the latter tribunal will presume that the federal court had jurisdiction, unless the contrary appears on the face of the record." 50 C.J.S. JUDGMENTS § 729 (collecting cases); *but see Bell Helicopter Textron, Inc.*, 734 F.3d at 1181 ("A judgment remains void even after final judgment if the issuing court lacked subject-matter jurisdiction, regardless

---

Virgin Islands District Court in this case did not determine any rights under federal law, but granted a temporary restraining order and injunction solely based on an interpretation of Virgin Islands local law. Moreover, the *Payne* case before the Virgin Islands District Court was a non-adversarial proceeding in which all parties stipulated to the law and consented to issuance of an injunction, thus preventing the order from being appealed to the Third Circuit Court of Appeals. And as we also explain below, a state court is bound to apply a federal court judgment involving the same parties if, and only if, the federal court actually possessed jurisdiction to render the judgment, *see Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 362 (2d Cir. 2000) (citing RESTATEMENT (SECOND) OF JUDGMENTS § 69 (1980)), and the New Jersey Supreme Court, in its *In re Contest of November 8, 2011 General Election*, never held that the federal court lacked jurisdiction, but only concluded that it misinterpreted federal law. Notably, the conflict between the New Jersey Supreme Court and the New Jersey District Court remains unresolved to this day, for neither court's decision has been modified or vacated.

441

of whether there existed an 'arguable basis' for jurisdiction."). However, we again emphasize that this Court, the Superior Court, and the District Court are all Article IV courts, with this Court and the Superior Court owing no deference to the District Court on issues of federal or local law, under the Supremacy Clause or otherwise. Significantly, the United States Supreme Court held, in a case in which a dispute arose as to which of two Article III courts — the United States Court of Appeals for the Seventh Circuit, or the United States Court of Appeals for the Federal Circuit — possessed jurisdiction over an appeal, that the Federal Circuit was not just *permitted*, but *required* to revisit the Seventh Circuit's conclusion that it lacked jurisdiction. *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 817, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988). We can think of no reason as to why this Court — an Article IV court — should not, at an absolute minimum, be permitted — if not required — to examine the jurisdiction of another Article IV court, particularly when that Article IV court premised its decision entirely on an issue of local law upon which this Court serves as the final arbiter. 48 U.S.C. § 1613; *Edwards*, 497 F.3d at 361-62 & n.3.

Even if we were persuaded — despite our shared statuses as Article IV courts — that this Court should, for purposes of ascertaining the validity of the District Court orders, treat the District Court as if it were an Article III court and this Court and the Superior Court as if we were state courts, we would reach the same result. Contrary to Hansen and Fawkes's claim that there is an absolute bar on state courts reexamining decisions rendered by a federal Article III court in a case involving one or more of the same parties, the law only creates a *presumption* that the Article III court appropriately exercised its jurisdiction. 50 C.J.S. JUDGMENTS § 729 (collecting cases). "[P]resumptions are precisely that — presumptions, i.e. 'procedural device[s] to force the party against whom the presumption operates to come forward with rebuttal evidence.' " *Rivera-Moreno v. Gov't of the V.I.*, 61 V.I. 279, 316 (V.I. 2014) (quoting *Walker v. Mortham*, 158 F.3d 1177, 1183 n.10 (11th Cir. 1998)). Notably, the United States Supreme Court has held that it is "the general rule" that "a judgment is entitled to full faith and credit — even as to questions of jurisdiction — when the second court's inquiry discloses that those questions *have been fully and fairly litigated* and finally decided in the court which rendered the original judgment."

*Durfee v. Duke*, 375 U.S. 106, 111, 84 S. Ct. 242, 11 L. Ed. 2d 186 (1963) (emphasis added).

In this case, we cannot see how the question of the District Court's jurisdiction could have been "fully and fairly litigated," given that all of the parties to the case agreed on every issue, with Fawkes stipulating to issuance of a temporary restraining order and injunction without even attempting to set forth any defense, jurisdictional or otherwise. *See Payne I*, 2014 U.S. Dist. LEXIS 127697 at *4 n.4 (noting that "the substantive positions of the parties were identical in virtually all material respects," with the sole difference between Hansen and Fawkes being that Fawkes desired a court order directing her to place Hansen on the ballot while Hansen believed a court order was not required). Given that the *Payne* matter was clearly not an adversarial proceeding, but a case in which the parties who lost in the *Bryan I* matter stipulated to every legal issue of substance,[8] we conclude that the District Court decision cannot be presumed valid.[9] *See* 13 CHARLES A. WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3530 (3d ed. 2004) (characterizing the "rule against suits brought by cooperating interests for the purpose of affecting the interests of nonparties" as "fundamental").

■ ■ Moreover, as noted above, an additional exception to the presumption of the correctness of an Article III court's judgment exists, in that a state court need not give deference and effect to an Article III court's decision if it is apparent, from the face of the federal court's .

---

[8] In fact, given the District Court's explicit finding that all of the parties in the *Payne* case agreed on every legal issue, including the fact that a temporary restraining order and permanent injunction should issue, it is not clear to this Court how a live case and controversy was before the District Court. *See Johnson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 719 F.3d 601, 603, 605 (7th Cir. 2013) (noting a probable lack of federal district court subject matter jurisdiction when the plaintiff and the defendant agreed on all of the major legal issues, since no case or controversy under Article III existed); *Russell v. deJongh*, 491 F.3d 130, 133 n.3, 48 V.I. 1062 (3d Cir. 2007) (holding that Virgin Islands District Court, despite its status as an Article IV court, "is subject to the limitations of Article III," including the limitation on only deciding live cases and controversies); *Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc.*, 374 F.2d 28, 32 (3d Cir. 1967) (holding that a collusive action should not be heard by a federal district court); *see also United States v. Accra Pac, Inc.*, 173 F.3d 630, 633 (7th Cir. 1999) (federal "district judges can't suspend the application of Article III" and "litigants can't stipulate to the enlargement of federal jurisdiction," for "[a] case or controversy must be present at every moment of the litigation").

[9] Notably, the fact that the *Payne* matter was completely uncontested prevented any of the parties from appealing the District Court's decisions to the Third Circuit.

record, that the court lacked jurisdiction. 50 C.J.S. JUDGMENTS § 729. In this case, it is readily apparent that the District Court lacked jurisdiction to issue a temporary restraining order or injunction based solely on its interpretation of Virgin Islands law. As indicated earlier, the complaints filed by Hansen and the five voters[10] raised exclusively federal claims; at no point did they ever request that the District Court exercise supplemental jurisdiction to consider whether a restraining order or injunction should issue based on Virgin Islands statutory law. Rather, the District Court issued the temporary restraining order and injunction not based on any of the federal claims Hansen or the voters raised in their complaints, but exclusively pursuant to its prediction of how this Court would interpret section 411 of title 18 of the Virgin Islands Code — an issue of Virgin Islands statutory law that it raised *sua sponte*. Unquestionably, the District Court lacked the authority to invoke its supplemental jurisdiction[11] to issue an injunction pursuant to 18 V.I.C. § 411 when no such claim was actually raised in the complaints filed by Hansen or the voters:

> The district court's opinion also implies that it had jurisdiction over Musson's state law claims under the doctrine of supplemental jurisdiction, now partly codified at 28 U.S.C. § 1367. The obvious problem

---

[10] Although not determinative to our analysis given that Hansen clearly possessed standing to challenge any decision to remove her name from the general election ballot, *see Bowsher v. Synar*, 478 U.S. 714, 721, 106 S. Ct. 3181, 92 L. Ed. 2d 583 (1986) (holding that it does not matter whether all plaintiffs have standing if one plaintiff does), it is not clear to this Court how the five voters possessed standing to challenge Hansen's failure to appear on the ballot. As we explain in greater detail later in this opinion, it is clear that the Governor's pardon has rendered Hansen eligible to serve in the 31st Legislature if elected. Since the Virgin Islands authorizes individuals to run as write-in candidates, nothing prohibits these five voters from casting a write-in vote for Hansen.

[11] In fact, as noted above, the District Court never identified, in its orders in *Payne I, Payne II*, or *Payne III*, the jurisdictional basis for issuing a temporary restraining order or injunction based solely on an interpretation of Virgin Islands law. Rather, the District Court referenced supplemental jurisdiction as its authority for issuing the *Payne* orders for the first time in its opinion in *Bryan III*, where it stated that it could exercise supplemental jurisdiction pursuant to the Third Circuit's decision in *Coffelt v. Fawkes*, 765 F.3d 197 (3d Cir. 2014). However, the *Coffelt* opinion clearly reflects that — unlike Hansen and the other plaintiffs in the *Payne* matter — the plaintiff in that case had, in fact, pleaded "the related claim . . . that Fawkes simply misapplied Virgin Islands election law." *Id.* at 201. Importantly, the *Coffelt* court also recognized that the plaintiff's claim that Fawkes acted contrary to local Virgin Islands law "is not the sort over which federal district courts typically may exercise original jurisdiction." *Id.*

with the exercise of supplemental jurisdiction over Musson's state law claims is *that Musson never pled these claims in the district court*.

. . . .

At oral argument, both the defendant and the plaintiff told this court that state law claims were "impliedly" pled (without citing a source in the complaint for such an implication), and that supplemental jurisdiction was proper for this reason. We disagree. Modern pleading rules may be lax, but they still require that a party plead a claim before the court decides it. Furthermore, FED. R. CIV. P. 8 requires the complaint to contain "a short and plain statement of the grounds upon which the court's jurisdiction depends." At a minimum, this requires a plaintiff to identify state claims as such, or to cite the supplemental jurisdiction rule at 28 U.S.C. § 1367.

*Musson Theatrical, Inc. v. Federal Exp. Corp.*, 89 F.3d 1244, 1253-54 (6th Cir. 1996) (emphasis in original).

█ Even if we were to look beyond the District Court's decision to grant a temporary restraining order and injunction *sua sponte* on a claim that had never been pled, other reasons exist to question the District Court's subject matter jurisdiction. As noted earlier, Hansen and the voters argued, in their emergency motion to enjoin the Superior Court proceedings that was eventually denied through the *Payne III* opinion, that the District Court's jurisdiction over the *Payne* case, as well as the Superior Court's jurisdiction over the *Bryan* case, were *in rem* rather than *in personam*. An *in personam* action is one where the party bringing the action seeks a personal judgment against the defendant, such as an award of monetary damages. *Kline v. Burke Constr. Co.*, 260 U.S. 226, 230, 43 S. Ct. 79, 67 L. Ed. 226 (1922); *Retirement Sys. of Ala. v. J.P. Morgan Chase & Co.*, 386 F.3d 419, 426 (2d Cir. 2004). In contrast, an *in rem* action "is one in which the judgment of the court determines the title to property and the rights of the parties, not merely as between themselves, but also as against all persons at any time dealing with them or with the property," or "res," "upon which the court had adjudicated." BLACK'S LAW DICTIONARY 864 (9th ed. 2009).

█ The District Court, in its *Payne III* opinion, stated, without citing to any legal authority or attempting to predict how this Court would rule on the question, that "[t]he actions in both this Court and the Superior

Court are *in personam* actions," apparently because Hansen and the voters "d[id] not explain . . . what would constitute the '*res.*'" 2014 WL 4979449, at *4. In doing so, it ignored numerous decisions from other courts expressly holding that an election contest is, in fact, an *in rem* proceeding, with the "*res*" being the election itself. *See Taimanao v. Superior Court of Commonwealth of Northern Mariana Islands*, 4 N.M.I. 94, 100 (N.M.I. 1994); *Foster v. Evert*, 751 S.W.2d 42, 45 (Mo. 1988) ("[W]e conclude that an election contest is procedurally analogous to an *in rem* action. The *res* is the election itself. The trial court acquires jurisdiction over the *res* when the election contest petition is filed in conformity with the requirements of [the local statute]."); *Horn v. Gibson*, 352 S.W.3d 511, 517 (Tex. App. 2011) ("The contest of an election is an action *in rem*, and not *in personam.*" (quoting *Evans v. State*, 55 Tex. Crim. 450, 117 S.W. 167, 167-68 (1909))); *accord Genger v. TR Investors, LLC*, 26 A.3d 180, 199-200 (Del. 2011) (holding judicial proceeding relating to election of corporate officers "is not an *in personam* action" but "is in the nature of an *in rem* proceeding, where the 'defendants' are before the court, not individually, but rather, as respondents being invited to litigate their claims to the *res* (here, the disputed corporate office) or forever be barred from doing so" (internal quotation marks and footnote omitted)); *Scheer v. City of Miami*, 15 F. Supp. 2d 1338, 1339 (S.D. Fla. 1998) (characterizing earlier lawsuit challenging vote count in election as an *in rem* lawsuit).[12] In fact, this Court cannot locate a single case — other than the *Payne III* opinion itself

---

[12] We recognize that several of these cases refer to election contests, and that Bryan's action against Hansen might be more accurately described as an election protest. However, the only difference between an election protest and an election contest is that an election protest refers to a judicial proceeding initiated prior to election day, whereas an election contest refers to such a proceeding initiated after the election has already occurred. *Smith v. Scioto Cnty. Bd. of Elections*, 123 Ohio St. 3d 467, 2009 Ohio 5866, 918 N.E.2d 131, 133-34 (2009); *but see Harden v. Garrett*, 483 So. 2d 409, 412 (Fla. 1985) (noting that both an election protest and an election contest had been filed after the election had concluded). In this context, we conclude that the cases characterizing election contests as *in rem* proceedings apply with equal force to election protests, particularly given that the res — the election administered by the appropriate election authorities — remains the same regardless of whether judicial proceedings are initiated before or after the election occurs, as the same strict statutory procedures governing the contest or protest must be followed in either case.

— where a court ever characterized a lawsuit brought to adjudicate an election dispute as an *in personam* proceeding.

■ The distinction between an *in rem* action and an *in personam* action is not merely academic, for the United States Supreme Court — which "is the final arbiter of conflicts between the several sovereignties under our federal system," *Delaware Valley Citizens' Council for Clean Air v. Pennsylvania*, 755 F.2d 38, 43 (3d Cir. 1985) — has held that the jurisdictional authority of state and federal courts in cases — such as this one — where they share concurrent jurisdiction to adjudicate a dispute will differ depending on whether the action is *in personam* or *in rem*. The United States Supreme Court has held that, as a general rule, "where the judgment sought is strictly *in personam*, both the state court and the federal court, having concurrent jurisdiction, may proceed with the litigation at least until judgment is obtained in one of them which may be set up as res judicata in the other." *Princess Lida of Thurn and Taxis v. Thompson*, 305 U.S. 456, 466, 59 S. Ct. 275, 83 L. Ed. 285 (1939). But "[o]n the other hand, if the two suits are *in rem*, or quasi *in rem* . . . the jurisdiction of the one court must yield to that of the other." *Id.* To determine which court must yield, the United States Supreme Court has established a bright-line rule "that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other." *Id.*; *see also Zachman v. Erwin*, 186 F. Supp. 681, 687 (S.D. Tex. 1959) ("Where a state court has jurisdiction over property, whether *in rem* or quasi *in rem*, a federal court of coordinate jurisdiction is disabled from exercising like power.") (citing *Palmer v. Texas*, 212 U.S. 118, 29 S. Ct. 230, 53 L. Ed. 435 (1909) & *Penn General Casualty Co. v. Pennsylvania*, 294 U.S. 189, 55 S. Ct. 386, 79 L. Ed. 850 (1935)); *Greenhouse v. Hargrave*, 1973 OK 48, 509 P.2d 1360, 1363 (1973) ("At least in actions *in rem* or quasi *in rem*, it is the established doctrine that, as between state and federal courts of coordinate jurisdiction, the court, whether state or federal which first acquired jurisdiction, will retain that jurisdiction until the final termination of the controversy.").

■ Although the District Court in the *Payne* matter sought to distinguish between "prepardon" and "postpardon" proceedings — apparently implying that the proceedings before this Court and the Superior Court somehow automatically came to a close after the Governor pardoned Hansen, even though Virgin Islands law provides no

447

basis for such a holding[13] — it is clear that the proceedings in the Virgin Islands local courts relating to whether Hansen's name should appear on the general election ballot had not terminated, but were ongoing and being actively litigated in both this Court and the Superior Court. As noted earlier, Virgin Islands Supreme Court Rule 31(a) authorized any party to a case before this Court to file a petition for rehearing within 14 days of entry of judgment, and that deadline had not yet lapsed by the time Hansen and the five voters filed their District Court complaints. In fact, Fawkes actually filed a timely rehearing petition, raising many of the same issues that were being considered by the District Court, including the issue of whether Hansen possessed an automatic right to cure, the local law issue on which the District Court based its decision to grant a temporary restraining order and injunction. And the proceedings before the Superior Court were also ongoing, given that any party possessed the right to file a motion to alter the judgment within 28 days pursuant to Superior Court Rule 50, or to enforce the judgment pursuant to 4 V.I.C. §§ 243(4) or 281. Moreover, the record reflects that the District Court had actual notice of the pending rehearing petition prior to issuing its temporary restraining order, and, as a result of Hansen's removal petition, possessed — at a minimum — constructive notice of Bryan's pending motion to enforce the Superior Court's August 29, 2014 order prior to issuing its permanent injunction. As such, the District Court acted outside its jurisdiction when, notwithstanding binding United States Supreme Court precedent to the contrary, it adjudicated Hansen's claims even though an earlier *in rem* proceeding had been filed in the Virgin Islands court system and was still ongoing. *Princess Lida*, 305 U.S. at 466.

---

[13] It is well-established that the Revised Organic Act "divides the power to govern the territory between a legislative branch, an executive branch, and a judicial branch," reflecting that "Congress 'implicitly incorporated the principle of separation of powers into the law of the territory.' " *Kendall v. Russell*, 572 F.3d 126, 135, 52 V.I. 1021 (3d Cir. 2009) (quoting *Smith v. Magras*, 124 F.3d 457, 465, 37 V.I. 464 (3d Cir. 1997)) (citations omitted). Unquestionably, neither the Governor nor any other executive branch official possesses the authority to take any action — by pardon or otherwise — that would render a court order void; the power to set aside a court order is vested exclusively with the judicial branch. *See In re Lavine*, 2 Cal. 2d 324, 41 P.2d 161, 163 (1935) (holding statute directing reinstatement of disbarred attorneys upon receipt of executive pardon is "unconstitutional and void as a legislative encroachment upon the inherent power of th[e] court to admit attorneys to the practice of law, and is tantamount to the vacating of a judicial order by legislative mandate.").

 Even if we were to hypothetically assume that the petition Bryan filed with the Superior Court initiated an *in personam* proceeding rather than an *in rem* proceeding, it would still be apparent, from the face of the record, that the District Court exceeded the scope of its subject matter jurisdiction. The *Rooker-Feldman* doctrine — a jurisdictional doctrine that the District Court never acknowledged in any of its opinions in the *Payne* proceeding, although it was raised by the voter plaintiffs and Hansen in their respective complaints — refers to principles set forth by the United States Supreme Court in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983). In *Rooker*, the United States Supreme Court held that, absent explicit authorization from Congress, a federal district court lacks subject matter jurisdiction to sit as a *de facto* appellate court over a state court judgment, even when the party that lost in the state court proceeding alleges that the judgment violated the United States Constitution. 263 U.S. at 415. The United States Supreme Court unambiguously held that, rather than initiating a second proceeding in a lower federal court to set aside the judgment, the sole remedy available is to seek review of the state courts' disposition in the United States Supreme Court itself. *Id.* In *Feldman*, the United States Supreme Court expanded the *Rooker* decision to the District of Columbia Court of Appeals — the highest local court of the District of Columbia, established by Congress as an Article I court that is functionally equivalent to an Article IV court[14] — and reaffirmed that the federal question jurisdiction conferred upon federal district courts cannot be used to review the legality of a prior decision by either a state or Article I court. 460 U.S. at 476; *Habib v. Cruz*, 17 Fed. Appx. 666, 667 (9th Cir. 2001) (applying *Rooker-Feldman* to invalidate federal court review of issues decided by the territorial courts of Guam); *see also Jordahl v. Democratic Party of Virginia*, 122 F.3d 192, 197 (4th Cir. 1997)

---

[14] *See United States v. Dixon*, 509 U.S. 688, 726, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993) ("The [District of Columbia] Superior Court and the District of Columbia Court of Appeals were created by Congress, pursuant to its power under Article I of the Constitution.") (citing *Palmore v. United States*, 411 U.S. 389, 93 S. Ct. 1670, 36 L. Ed. 2d 342 (1973)); *Kuretski v. C.I.R.*, 755 F.3d 929, 942, 410 U.S. App. D.C. 287 (D.C. Cir. 2014) (observing that the territorial courts established by Congress under Article IV of the United States Constitution are simultaneously legislative courts under Article I of the Constitution); *Americana of Puerto Rico, Inc. v. Kaplus*, 368 F.2d 431, 437-38 (3d Cir. 1966) (same).

(emphasizing that *Rooker-Feldman* doctrine is jurisdictional). While the breadth of the *Rooker-Feldman* doctrine has since been narrowed, it remains clear that the doctrine

> is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005).

 In this case, while the District Court purported not to review the correctness of this Court's August 28, 2014 opinion and the Superior Court's August 29, 2014 order implementing that opinion, *see Payne II*, 2014 U.S. Dist. LEXIS 134451 at *2 n.2, it is the substance, and not the form, of the District Court's decision that determines whether the *Rooker-Feldman* doctrine has been violated. *American Reliable Insurance v. Stillwell*, 336 F.3d 311, 319 (4th Cir. 2003) (emphasizing that "the *Rooker-Feldman* doctrine . . . elevat[es] substance over form" in order to assure that the independence of local courts be preserved and to implement the congressional intent that an appeal from a local court decision must proceed through that jurisdiction's system of appellate review rather than the lower federal courts.). Therefore, *Rooker-Feldman* is violated even if the lower federal court leaves the state court judgment intact, but "take[s] action that would render the [state court] judgment ineffectual." *Ernst v. Child & Youth Servs.*, 108 F.3d 486, 491 (3d Cir. 1997); *Jordahl*, 122 F.3d at 202 (same).

Here, the District Court was clearly aware that Fawkes and Hansen were both parties to the proceedings before this Court and the Superior Court, and that the Superior Court's August 29, 2014 order specifically ordered Fawkes to remove Hansen's name from the ballot. Yet the District Court chose to issue a temporary restraining order on September 12, 2014, that directed Fawkes to place Hansen's name on the ballot — the very situation that the *Rooker-Feldman* doctrine is intended to prevent. Additionally, by the time the District Court issued its September 24, 2014 permanent injunction, this Court had already issued its September 12, 2014 order denying Fawkes's petition for rehearing, which adjudicated

the very same issue of local law on which the District Court premised its decision to grant a temporary restraining order and injunction. To reach this result, the District Court first disregarded the September 12, 2014 order on the ground that it was unpublished. In doing so, it relied exclusively on former provisions of the Virgin Islands Supreme Court Internal Operating Procedure that had been repealed, while ignoring (1) the new Internal Operating Procedures that this Court promulgated on March 14, 2014,[15] which expressly provide that unpublished opinions may be cited and relied upon,[16] and (2) that the plain text of those former Internal Operating Procedures provided that unpublished decisions were nevertheless binding on the parties to the appeal, of which three — Fawkes, Hansen, and the Joint Board of Elections — were also parties to the District Court proceeding. In other words, the District Court elevated a repealed set of Internal Operating Procedures over the Internal Operating Procedures currently in effect, and interpreted those repealed Internal Operating Procedures in a manner contrary to their plain text.

▮ More significantly, even though this Court's September 12, 2014 order expressly stated, in unambiguous terms, that "candidates whose nomination papers have been challenged in the courts do not have an automatic right to cure the defect," *Bryan II*, slip op. at 3, the District Court announced in *Payne II* that it would not follow this directive because it believed this Court's interpretation "would appear to raise significant issues" with respect to the Revised Organic Act and "would seem to build an inequity into the nominations process based on the fortuity of whether a candidate happens to be the first person whose particular type of defect is accepted by the Supervisor of Elections and then successfully challenged in court." 2014 U.S. Dist. LEXIS 134551 at *43. As we shall explain in greater detail in the following section with

---

[15] *See In re Amendments to the Virgin Islands Supreme Court Internal Operating Procedures and Style Guide*, S. Ct. Prom. No. 2014-003, slip op. at 1 (V.I. Mar. 14, 2014) (striking existing Virgin Islands Supreme Court Internal Operating Procedures in their entirety and replacing them with new Internal Operating Procedures, to come into effect on April 1, 2014); VIRGIN ISLANDS COURT RULES ANN. 69 (May 2014 supp.) (identifying Supreme Court Internal Operating Procedures as having been amended on April 1, 2014).

[16] *See* V.I.S.CT.I.O.P. 5.7.1(a) ("An unpublished judicial opinion, order, judgment or other written disposition of this court may be cited regardless of the date of issuance."); V.I.S.CT.I.O.P. 5.3 (noting that an unpublished opinion generally has "*little* or no precedential or institutional value" but nevertheless "has value [to] the parties").

respect to whether Bryan is entitled to enforcement of the August 29, 2014 order, we disagree with the District Court, and reaffirm our September 12, 2014 order's interpretation of the cure provisions found in sections 411 and 412 of title 18 of the Virgin Islands Code. But even if we are mistaken and our interpretation of these statutory provisions may render the election protest and contest system inequitable, it is so well-established as to not require citation that the appropriate remedy is not for the District Court to "correct" our decision, but for Fawkes or Hansen to file a petition for writ of certiorari of our decision with the United States Supreme Court.[17] *Exxon Mobil Corp.*, 544 U.S. at 292 ("[Federal law], as long interpreted, vests authority to review a state court's judgment solely in [the United States Supreme] Court."); *In re Madera*, 586 F.3d 228, 232 (3d Cir. 2009) ("The *Rooker-Feldman* doctrine precludes lower federal courts 'from exercising appellate jurisdiction over final state-court judgments' because such appellate jurisdiction rests solely with the United States Supreme Court." (quoting *Lance v. Dennis*, 546 U.S. 459, 463, 126 S. Ct. 1198, 163 L. Ed. 2d 1059 (2006))).

We emphasize, in the strongest terms possible, that we have not reached our decision to disregard the District Court's orders lightly. Had

---

[17] For similar reasons, we also question whether the District Court's actions were contrary to the federal Anti-Injunction Act, 28 U.S.C. § 2283. Although the District Court did not purport to issue an injunction enjoining further proceedings in this Court or the Superior Court, it is well-established — as with the *Rooker-Feldman* doctrine — that it is the substance, and not the form, of the federal court's action that must be considered in determining whether the Anti-Injunction Act is violated by a federal court's decree. *See, e.g., Gloucester Marine Railways Corp. v. Charles Parisi, Inc.*, 848 F.2d 12, 15 (1st Cir. 1988). As the United States Supreme Court has held,

> [The Anti-Injunction Act] includes all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process. . . . It applies alike to action by the court and by its ministerial officers; applies not only to an execution issued on a judgment, but to any proceeding supplemental or ancillary taken with a view to making the suit or judgment effective.

*Hill v. Martin*, 296 U.S. 393, 403, 56 S. Ct. 278, 80 L. Ed. 293 (1935) (citations and footnotes omitted). Given that the District Court expressly ordered Fawkes to place Hansen's name on the ballot notwithstanding the Superior Court's August 29, 2014 order specifically directing Fawkes to do precisely the opposite, it is not clear how the Superior Court's judgment could be effective if the District Court's orders remain in force. However, because the Anti-Injunction Act has been characterized as "not strictly jurisdictional," *Gloucester Marine Railways Corp.*, 848 F.2d at 15 (citing *Smith v. Apple*, 264 U.S. 274, 278-79, 44 S. Ct. 311, 68 L. Ed. 678 (1924)), we need not discuss this issue as part of this appeal.

the events giving rise to this appeal occurred a decade ago, it is unquestionable that the District Court would have possessed jurisdiction to issue a temporary restraining order and injunction that frustrated enforcement of a contrary Superior Court judgment. This is so because, prior to this Court's assumption of jurisdiction on January 29, 2007, the District Court served not only as a federal trial court, but as an appellate court that could sit in review of Superior Court decisions. *Maynard v. Rivera*, 675 F.3d 225, 228 n.5, 56 V.I. 885 (3d Cir. 2012). "Under this [former] jurisdictional framework, the District Court of the Virgin Islands heard the majority of cases brought in the Virgin Islands" — either at the trial level or on appeal — "whether those cases were brought under federal law or local law, civil law or criminal law." *Birdman v. Office of the Governor*, 677 F.3d 167, 175, 56 V.I. 973 (3d Cir. 2012) (quoting *Callwood v. Enos*, 230 F.3d 627, 630, 43 V.I. 293 (3d Cir. 2000)).

Yet, as a direct result of this Court's creation, the role of the District Court in shaping Virgin Islands law fundamentally changed. On January 28, 2007, the District Court possessed plenary authority over all issues of Virgin Islands law by virtue of its appellate jurisdiction over the Superior Court, subject only to review by the United States Court of Appeals for the Third Circuit. But upon this Court's assumption of jurisdiction on January 29, 2007, "[t]he relationship between the federal courts and the territorial courts [became] largely governed by the precepts that govern the relationship between federal and state courts," with the District Court now being required "to defer to [Virgin Islands] courts' interpretations of [Virgin Islands] law." *Hodge v. Bluebeard's Castle*, 392 Fed. Appx. 965, 975 (3d Cir. 2011) (citing 48 U.S.C. § 1613 & *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 661 (3d Cir. 1980)). The Third Circuit, in one of the earliest appeals from the District Court that it adjudicated after this Court assumed operations, acknowledged that this sudden transition may prove difficult both for litigants and the District Court itself:

> Edwards errs when he argues that the District Court of the Virgin Islands still remains vested with the "judicial power of the territory." He cites a pre-1984 case of this court for the proposition that the District Court of the Virgin Islands sits "essentially as a local court," not a federal court interpreting local law, *V.I. Dep't of Conservation & Cultural Affairs v. V.I. Paving, Inc.*, 714 F.2d 283, 285-86, 19 V.I. 642

(3d Cir. 1983), but that opinion preceded the restructure of the courts of the Virgin Islands.

. . . .

We recognize that it is not easy for the District Court, which has contributed generously and productively to the local law of the Virgin Islands, to accept its divestiture but that follows inexorably from the statutes and is confirmed by the legislative history. . . . We therefore take this opportunity to reject any statements to the contrary in District Court opinions. *See, e.g., Spink v. Gen. Accident Ins. Co. of Puerto Rico, Ltd.,* 36 F. Supp. 2d 689, 691, 40 V.I. 396 (D.V.I. 1999) ("This court need not predict local law . . . because it is vested with the authority to decide novel questions as a local trial court.").

*Edwards,* 497 F.3d at 359.

▉ Ensuring comity between this Court, the Superior Court, and the District Court is an important judicial interest, particularly during this transition period where the District Court continues to adjudicate appeals that were filed with it prior to January 29, 2007, *see Hughley v. Gov't of the V.I.,* 536 Fed. Appx. 278, 280 n.3 (3d Cir. 2013), while this Court undertakes the task of developing, for the very first time, indigenous Virgin Islands jurisprudence. *Banks v. Int'l Rental and Leasing Corp.,* 55 V.I. 967, 978 (V.I. 2011); *Pichardo v. V.I. Comm'r of Labor,* 613 F.3d 87, 95, 53 V.I. 936 (3d Cir. 2010). To promote comity and an orderly transition, this Court directed the Superior Court to continue to treat decisions of the District Court sitting in its appellate capacity as binding precedent. *See In re People of the V.I.,* 51 V.I. 374, 389 n.9 (V.I. 2009). Recognizing — as the Third Circuit did in *Edwards* — that attempting to predict how this Court would resolve questions of local law may prove difficult for the District Court, this Court promulgated Supreme Court Rule 38, which established a procedure for federal courts to request that this Court answer a question of Virgin Islands law in cases "in which it appears there is no controlling precedent in the decisions of the Supreme Court." V.I.S.CT.R. 38(a). And this Court has not hesitated to reverse the Superior Court when it has rendered a decision that interferes with a case that is properly before the federal courts, even when the comity issue was not raised by any of the parties to the appeal. *Simon v. Joseph,* 59 V.I. 611, 626 (V.I. 2013); *Yusuf v. Hamed,* 59 V.I. 841, 860 (V.I. 2013).

▉ But "comity is not a one way street." *McGee v. Estelle,* 722 F.2d 1206, 1214 (5th Cir. 1984) (en banc) (quoting *Thompson v. Wainwright,*

714 F.2d 1495, 1509 (11th Cir. 1983)). "Just as this Court will defer to a foreign court if the circumstances require it, so too should a foreign court defer to this Court when appropriate." *In re RHTC Liquidating Co.*, 424 B.R. 714, 725 (Bankr. W.D. Pa. 2010). "A court's deliberate reshaping of an action to substantially overlap an existing suit in a sister [jurisdiction], as the means of frustrating or precluding the prosecution of the prior suit in the other [jurisdiction], is hardly geared towards gaining universal acclaim," but rather represents "an unduly expansive approach to the power to issue such an order." *Continental Ins. Co. v. Honeywell Int'l, Inc.*, 406 N.J. Super. 156, 967 A.2d 315, 330 (2009).

Simply put, "comity does not command abdication." *Doody v. Ryan*, 649 F.3d 986, 1006 (9th Cir. 2011) (en banc). This Court has been vested with "the supreme judicial power of the Territory." 4 V.I.C. § 21. Congress, exercising its powers under Article IV of the United States Constitution, has determined that this Court shall have the final word on issues of Virgin Islands law. In fact, with the enactment of Public Law 112-226 on December 28, 2012, Congress has precluded even the United States Supreme Court from reexamining this Court's determination of Virgin Islands law, so long as our decision would not be "repugnant to the Constitution, treaties, or laws of the United States." 28 U.S.C. § 1260.[18]

Yet despite the fact that this Court's authority to determine Virgin Islands law should now be beyond dispute, the District Court elected to issue a temporary restraining order and permanent injunction — *sua sponte*, and in a non-adversarial proceeding — premised exclusively on its interpretation of Virgin Islands local law, notwithstanding the fact that its orders directly contradicted the Superior Court's August 29, 2014 order, and despite being fully aware that the very same issue of local law was being actively litigated in both this Court and the Superior Court. Turning a blind eye to the District Court's usurpation of authority in this case would not further comity principles, but would instead represent an

---

[18] This statute provides, in its entirety, that

Final judgments or decrees rendered by the Supreme Court of the Virgin Islands may be reviewed by the [United States] Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of the Virgin Islands is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.

abdication of this Court's constitutional, statutory, and inherent authority to decide questions of Virgin Islands law to the District Court, an entity that both Congress and the Virgin Islands Legislature have determined should no longer wield "the judicial power of the territory." *Edwards*, 497 F.3d at 359; *accord Banks*, 55 V.I. at 980 (noting that it is unlawful to "completely deprive[ ] this Court of the ability to exercise its supreme judicial power to shape the common law" and instead "delegate[ ] that power" to another body).

 For all of the foregoing reasons, we conclude that the District Court lacked subject matter jurisdiction to enter its temporary restraining order and permanent injunction. As such, they are therefore void and do not serve as a bar to enforcing either this Court's August 28, 2014 opinion, the Superior Court's August 29, 2014 order, or this Court's September 12, 2014 order.

## B. Continued Validity of Local Court Orders

Having determined that the District Court orders do not preclude the Superior Court or this Court from ordering enforcement of the local court orders, we must now consider whether those orders remain valid in light of the Governor's pardon and Hansen's attempt to submit new nomination papers.[19] In its October 10, 2014 order, the Superior Court, while concluding in error that it was bound by the District Court orders, also stated that in any event it agreed with the District Court on the merits. Specifically, the Superior Court concluded that the Governor's pardon superseded the August 29, 2014 order because it interpreted 18 V.I.C. § 411(c) as providing Hansen with an automatic three-day opportunity to cure, and reasoned that it was not bound by this Court's September 12, 2014 order holding that Hansen did not have an automatic right to cure because "the Supreme Court did not reach the issue of whether Hansen was entitled to a mandatory three day right to cure from Fawkes under § 411(b) and (c)." *Bryan IV*, slip op. at 10 n.12. Thus, while the Superior

---

[19] Although not directly raised by the parties on appeal, because the issue is relevant to the continued validity of the local court orders, we emphasize that we agree with the District Court's conclusion that the Governor's pardon could not operate retroactively. *See Payne I*, 2014 U.S. Dist. LEXIS 127697 at *14; *see also Patterson v. Dykes*, 804 N.E.2d 849, 852-53 (Ind. Ct. App. 2004) (pardon granted on August 14, 2003, not retroactive to November 5, 2002, or January 1, 2003).

Court clearly believed that its hands were tied as a result of the District Court orders, it is readily apparent that, even in their absence, the Superior Court would have declined to enforce the August 29, 2014 order.

We cannot endorse the Superior Court's reading of our September 12, 2014 order. That order said that "candidates whose nomination papers have been challenged in the courts do not have an automatic right to cure the defect." *Bryan II*, slip op. at 3. "[A]s we have repeatedly emphasized," when this Court includes plain, unambiguous language in a court order, court rule, or other court-issued document, this Court "simply means what it says."[20] *Fontaine v. People*, 59 V.I. 1004, 1012 n.8 (V.I. 2013). Thus trial courts "are not at liberty to surmise or search for hidden meanings within the opinions of . . . appellate courts," but must apply those decisions as written unless expressly permitted to do otherwise by the appellate court. *Brendle v. General Tire & Rubber Co.*, 304 F. Supp. 1262, 1266 (M.D.N.C. 1969); *cf. Gov't of the V.I. v. Connor*, 60 V.I. 597, 605 n.1 (V.I. 2014) (authorizing Superior Court to decline to follow prior precedents of this Court that had been decided based on erroneous reliance on 1 V.I.C. § 4).

We recognize that, in certain cases, a trial court, whether through the parties or as a result of its own research, may discover that the appellate court overlooked a statute that, if applied, might have changed the outcome of the appeal. In such a case, the trial court may understandably believe that it must place its duty to faithfully uphold the law over its duty to comply with the appellate court's mandate. *See Culpepper v. Inland Mortg. Corp.*, 243 F.R.D. 453, 456 (N.D. Ala. 2006) (noting that "[t]here is authority for the proposition that a trial court may depart from the mandate" of an appellate court in certain very narrowly

___

[20] We cannot ignore that, at the October 7, 2014 hearing, Fawkes's trial counsel — a different attorney than the one representing her in this appeal — argued, with respect to this Court's September 12, 2014 order, that "There's nothing in the Supreme Court's order, when you read it carefully, rather than putting a spin to suit your own argument, there's nothing in it that would suggest that the Supreme Court is saying Senator Hansen could not cure. There's nothing." (Hr'g Tr. 29.) While attorneys possess an obligation to zealously advocate on behalf of their clients, it is not clear to us how our statements that "candidates whose nomination papers have been challenged in the courts do not have an automatic right to cure the defect," and that Hansen had waived her right to a discretionary cure because "at no point did she request, in the alternative, that the Superior Court provide her with an opportunity to cure the defect alleged in Bryan's petition," *Bryan II*, slip op. at 3-4, could ever be interpreted as not even suggesting the *possibility* that Hansen might not be authorized to cure.

defined circumstances) (citing 18B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD COOPER, FEDERAL PRACTICE AND PROCEDURE, § 4478.3 (2d ed. 2002)).

 This was not such a case. Our September 12, 2014 order did not ignore 18 V.I.C. § 411; on the contrary, that very statute was cited and discussed in footnote 2 of the order, where this Court explained that section 411 was a different provision in the Virgin Islands Code relating to when a nomination paper is rejected by the Supervisor of Elections, rather than set aside by a court. *Bryan II*, slip op. at 3 n.2. In other words, this Court interpreted section 411 as the exclusive means to cure when the Supervisor of Elections unilaterally rejects a nomination paper, and section 412 as the exclusive means to cure when a nomination paper is set aside by a court.[21]

 Our interpretation is supported by the plain language of both statutes. Section 411, by its own terms, sets forth a procedure for the initial review of nomination papers by the Supervisor of Elections without judicial involvement, with section 411(c) establishing a right to cure in situations where the Supervisor of Elections refuses to accept a nomination paper:

> (a) *The Supervisor of Elections or his deputy shall forthwith examine the nomination petitions, nomination papers or nomination certificates filed with him under this chapter* and shall permit them to be

---

[21] As noted earlier, the District Court, in its *Payne I* opinion, predicted that this Court would adopt the position advanced by the Virgin Islands Attorney General in his advisory letter to the Governor. 2014 U.S. Dist. LEXIS 127697 at *24 n.11. However, this Court has already expressly rejected — on separation of powers grounds — granting any deference whatsoever to an opinion issued by the Attorney General:

> [T]he opinion of the Virgin Islands Attorney General — an officer of the Executive Branch — as to how Virgin Islands law should be interpreted is in absolutely no way binding on this Court or the Superior Court, since statutory interpretation is unquestionably a judicial power of which this Court is the final arbiter. *See* 4 V.I.C. § 21 ("The Supreme Court of the Virgin Islands is established . . . as the highest court of the Virgin Islands and in it shall be reposed the supreme judicial power of the Territory."); *Aero Mayflower Transit Co., Inc. v. I.C.C.*, 686 F.2d 1, 5-6, 222 U.S. App. D.C. 279 (D.C. Cir. 1982) ("[S]tatutory construction ultimately is a judicial function." (citation omitted)); *Unwired Telecom Corp. v. Parish of Calcasieu, La.*, 903 So. 2d 392, 404 (La. 2005) · ("The function of statutory interpretation and the construction given to legislative acts rests with the judicial branch of government." (citations omitted)).

*Galloway v. People*, 57 V.I. 693, 703 (V.I. 2012).

examined by any interested citizen. If the identity of any signer is unknown to him or if the identity or capacity of any signer seems to him doubtful or is challenged by any citizen, the Supervisor of Elections or his deputy within three days after the close of the nomination period shall hold a public hearing in the election district in which the signer in question purports to reside, to which hearing such signer and any material witnesses may be summoned. The Supervisor of Elections or his deputy shall determine the signer's identity and capacity and ascertain that the candidates have been validly nominated.

(b) *If the Supervisor determines that a candidate for election or nomination does not meet the qualifications established by law for the office, then he shall disqualify such candidate* and delete the candidate's name from the ballot if the ballots have not been printed.

(c) *When a nomination petition, nomination paper or nomination certificate is found to be defective the candidate shall be notified immediately by special messenger* with the reason or reasons therefor. If a new, valid petition, paper or certificate is not filed within three days thereafter the candidate shall be disqualified for nomination or election.

18 V.I.C. § 411 (emphases added). In contrast, section 412, again by its own terms, addresses situations where the Supervisor of Elections accepts a nomination paper pursuant to section 411 that the Superior Court later determines should not have been accepted, and provides for a different cure mechanism:

All nomination petitions and nomination papers received and filed under this chapter, *and accepted after the examination required by section 411 of this title*, shall be deemed to be valid, unless, within five days after the last day for filing such nomination petition or papers, a petition is presented to the [Superior Court], specifically setting forth the objections thereto, and praying that such petition or paper be set aside. A copy of the petition shall, within such period, be served on the officer with whom the nomination petition or paper was filed. Upon the presentation of such a petition the court shall make an order fixing a time for hearing which shall not be later than 10 days after the last day for filing such nomination petition or paper, and specifying the time and manner of notice that shall be given to the candidate named in the

459

nomination petition or paper sought to be set aside. On the day fixed for the hearing, the court shall proceed without delay to hear such objections, and shall give the hearing precedence over any other business before it, and shall finally determine the matter not later than 15 days after the last day for filing such nomination petitions or papers. If the court finds that the nomination petition or paper is defective under the provisions of section 411 of this title, or that it does not contain a sufficient number of genuine signatures of electors entitled to sign it under the provisions of this chapter, or was not filed by persons entitled to file it, it shall be set aside. *If the objections relate to material errors or defects apparent on the face of the nomination petition or paper, or on the face of the accompanying or appended affidavits, the court, after hearing, may, in its discretion, permit amendments within such time and upon such terms as to payment of costs, as the court may specify.* In case a petition under this section is dismissed, the court shall make such order as to the payment of the cost of the proceeding, including witness fees, as it shall deem just. If a person shall sign any nomination petitions or papers for a greater number of candidates than he is permitted under the provisions of this chapter, if such signatures bear the same date, they shall, upon objections filed thereto, not be counted on any petition or paper and if they bear different dates, they shall be counted in the order of their priority of date, for only so many persons as there are candidates to be nominated or voted for by an elector at the general election.

18 V.I.C. § 412 (emphases added).

 Had Fawkes rejected Hansen's nomination papers when they were originally filed in May 2014, it is at least arguable that section 411(c) may have authorized Hansen to submit new nomination papers within three days of the rejection.[22] But Hansen's nomination papers were not rejected by Fawkes; they were set aside by the Superior Court in its August 29,

---

[22] The parties, as well as the District Court, assume that the three-day cure provision set forth in section 411(c) applies to disqualifications under section 411(b). We are not convinced that the Legislature intended for the cure provision of section 411(c) to also apply to disqualifications under section 411(b), given that section 411(c) refers to nomination papers being rejected as defective, while section 411(b) refers to a candidate being disqualified for not meeting the minimum qualifications for office. In any event, we need not resolve this issue as part of this appeal, in light of our holding that section 411 has no applicability once a

2014 order. Thus to the extent section 412 even authorized a cure given the circumstances that led to her nomination papers being set aside,[23] Hansen was required to request that the Superior Court grant her time to obtain a pardon prior to setting aside her nomination papers.[24]

---

candidate's nomination papers have been judicially challenged pursuant to the section 412 procedure.

[23] As we noted in our September 12, 2014 order, we question whether Bryan's objection to Hansen's nomination papers — which was premised on her three convictions for crimes of moral turpitude — is one that "relate[s] to material errors or defects apparent on the face of the nomination petition or paper, or on the face of the accompanying or appended affidavits." 18 V.I.C. § 412. In any case, we need not resolve this issue, given that Hansen never requested that either the Superior Court or this Court grant her time to obtain a pardon prior to setting aside her nomination papers.

[24] The District Court, in its orders in *Payne I* and *Payne II*, stated that it relied on *Moorhead v. Gov't of the V.I.*, 18 V.I. 237 (V.I. Super. Ct. 1982) for the proposition that the three day cure provision found in section 411(c) applies even when a petition is set aside in a judicial proceeding brought under section 412. However, the *Moorhead* court instead reached precisely the opposite conclusion:

> Section 411 outlines the duties of defendant Todman in her capacity as Supervisor of Elections in regard to the examination of the nomination petitions, papers and certificates, and necessary action should any defects in said nomination material be present. It provides that if the Supervisor determines that a candidate for election or nomination does not meet the qualifications, then she shall disqualify such candidate and delete his name from the ballot if the ballots have not been printed. Section 411 also requires the Supervisor to notify a candidate immediately by special messenger if any of his nomination material is defective along with the reason or reasons for the defect. In view of the fact that plaintiff submitted his material in late August and he was not notified of any defects in said material until the 11th hour, it would appear that defendant Todman failed to timely inspect the nomination material and properly notify the plaintiff. That failure is frankly inexcusable.

> Despite this fact, the acts of defendant Todman do not give Moorhead the right to hold public office. Plaintiff, however, relies on the language of 18 V.I.C. § 412 to support his estoppel argument. Specifically section 412 provides that all nomination material received, filed, and "accepted after the examination required by section 411 of this title, shall be deemed to be valid, unless, within five days after the last day for filing" such material, a petition is presented to the district court setting forth any objections to the material and praying that such be set aside.

> *Section 412 speaks not to the Supervisor of Elections but to the public at large.* It affords an interested citizen the opportunity to timely object to a candidate's petition or papers. Section 412 allows objection after examination pursuant to section 411(b), and if no such proper objection is made within the time period, the nomination petition or paper is then deemed valid. *Nothing in section 412 or section 411 indicates that the mechanism provided for in section 412 is directly applicable to the Supervisor of Elections, defendant Todman.*

461

■ Additionally, in its *Payne II* opinion the District Court stated that it would not adopt our interpretation of sections 411 and 412 because doing so might be inequitable and may raise constitutional concerns. As a threshold matter, we do not agree with the District Court's claim that equity is in any way relevant to our statutory interpretation analysis. It is the Legislature, and not this Court — or any other — that has been vested with the authority to create Virgin Islands statutory law. As such, it is the Legislature that enacted sections 411 and 412, and made the decision to provide a candidate whose papers are rejected by the Supervisor of Elections with an automatic three-day right to cure, while conversely providing that a candidate whose papers are set aside by the Superior Court is not entitled to an automatic right to cure, but instead must request the Superior Court to grant discretionary relief. "Even if such a distinction were inequitable . . . it is not the courts' role to make such policy determinations" and to substitute its judgment for that of the Legislature. *Integrity Floorcovering, Inc. v. Broan-Nutone, LLC*, 521 F.3d 914, 918-19 (8th Cir. 2008).

■ While not determinative to our outcome given our conclusion that a judge's policy preferences are not sufficient reasons to justify disregarding the plain text of a statute, we note that the purported inequity identified by the District Court in its *Payne II* decision is based on an incorrect interpretation of section 412. In *Payne II*, the District Court stated that "an extension of the Supreme Court's 'no automatic right to cure' interpretation of Section 412 to Section 411 would seem to build an inequity into the nominations process based on the fortuity of whether a candidate happens to be the first person whose particular type of defect is accepted by the Supervisor of Elections and then successfully challenged in court." 2014 U.S. Dist. LEXIS 134451 at *43. According to the District Court, "because Senator Hansen's case is the first one of its type to be challenged successfully in the courts, she would not be entitled to an automatic right to cure under Section 412," whereas future candidates who seek legislative office despite having been convicted of the crime of

---

18 V.I. at 243-44 (emphases and paragraph breaks added, and internal citations and footnotes omitted).

willful failure to file income tax returns would receive an automatic three-day period to cure under section 411(c).[25]

 The District Court, however, appears to have reasoned that the absence of an *automatic* right to cure is tantamount to *no possibility* of a cure. Section 412, by its own terms, provides that "the court, after hearing, may, in its discretion, permit amendments within such time and upon such terms as to payment of costs, as the court may specify." 18 V.I.C. § 412. As we emphasized in our September 12, 2014 order, at no point in these proceedings — whether before the Superior Court initially, on appeal to this Court, or before the Superior Court on remand — did Hansen ever request that either court exercise its discretion to provide her with time to obtain a pardon prior to setting aside her nomination papers. "Modern pleading rules may be lax, but they still require that a party plead a claim before the court decides." *Musson Theatrical, Inc.*, 89 F.3d at 1253. In this case, absolutely nothing prevented Hansen — who we emphasize was a party to this case, having successfully moved to intervene — from pleading, in the alternative, that the Superior Court or this Court should grant her time to submit amended nomination papers in the event her convictions were determined to constitute crimes of moral turpitude. While there is no guarantee that such a request would have been

---

[25] To the extent that equity is in any way relevant to the statutory interpretation analysis, we note that while the District Court concluded that this Court's interpretation of sections 411 and 412 would be inequitable, it did not consider that its construction of these same provisions would also result in inequity — perhaps an even greater inequity than simply interpreting sections 411 and 412 based on their plain language. On its face, section 412 only authorizes judicial review if the Supervisor of Elections has accepted a nomination paper, while section 411(c) provides for an automatic three-day cure if the Supervisor of Elections rejects a nomination paper as defective. Thus, if the District Court were correct that the automatic three-day cure provision in section 411(c) applies even when it is the court, and not the Supervisor, that sets aside a nomination paper under section 412, the result would be that a candidate whose papers are rejected by the Supervisor would have a mere three days to cure, while a candidate whose papers are set aside through a section 412 proceeding could attempt a cure during the entire length of the Superior Court proceeding, *plus* an additional three days after that proceeding has concluded. For example, if two no-party candidates submit nomination papers bearing only 40 signatures rather than the required 50, *see* 18 V.I.C. § 381(b), the District Court's interpretation of sections 411 and 412 would provide that a candidate whose papers were rejected by the Supervisor with only three days to obtain the additional 10 signatures if the Supervisor of Elections sets the petition aside, while granting a candidate whose papers were accepted by the Supervisor and challenged in the Superior Court at least a month — or more if, as in this case, the statutory deadlines in section 412 are not followed by the Superior Court — to obtain the additional signatures.

granted, any denial could not have been "arbitrary" — the evil feared by the District Court, *see Payne II*, 2014 U.S. Dist. LEXIS 134451 at *43 — for an arbitrary denial would constitute an abuse of discretion that would subject that decision to reversal on appeal. *People v. Todmann*, 53 V.I. 431, 441 (V.I. 2010) ("In order to justify reversal [under an abuse of discretion standard], a [trial] court's analysis and resulting conclusion must be arbitrary or irrational." (quoting *United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 665 (3d Cir. 2000) (internal quotation marks omitted))).

We also disagree that applying sections 411 and 412 as they are written would render the statutes unconstitutional. In *Payne II*, the District Court reasoned that our interpretation of sections 411 and 412 may violate Section 6(b) of the Revised Organic Act[26] because it may "preclude the official restoration of Senator Hansen's eligibility for office" and "would seem to nullify the portion of Section 6(b) that renders a candidate eligible for office if the conviction is pardoned." 2014 U.S. Dist. LEXIS 134451 at *43. But as the District Court itself later recognized in *Bryan III*, there is "a distinction here between access to the ballot and other means through which a candidate might be able to run and be elected to office — e.g., through a write-in candidacy." 2014 U.S. Dist. LEXIS 139025 at *18 n.8.

 This Court has never held, whether in its September 12, 2014 order or in the instant opinion, that Hansen — despite having received a pardon from the Governor — is still not eligible to serve in the 31st Legislature. Rather, the issue is whether the Superior Court's August 29, 2014 order setting aside Hansen's nomination papers and directing that Fawkes remove her name from the general election ballot has somehow become invalid due to the Governor's September 3, 2014 pardon. Because section 412 vests the right for a candidate to cure a nomination paper that has been judicially set aside in the sound discretion of the Superior Court, and Hansen never sought such a cure, we conclude that the August 29, 2014 order must stand, and that Hansen's name may not be reinstated on the general election ballot. However, if Hansen were to mount a write-in candidacy — as she is entitled to do so under Virgin

---

[26] 48 U.S.C. § 1572(b) ("No person shall be eligible to be a member of the legislature who ... has been convicted of a felony or of a crime involving moral turpitude and has not received a pardon restoring his civil rights.").

Islands law — and be successfully elected by the voters, the August 29, 2014 order would not serve as an impediment to her certification as a winner of the general election and eventual swearing-in as a member of the 31st Legislature.[27]

Finally, we note that Hansen, in her brief in this appeal as well as her earlier filings in the District Court and the Superior Court, has taken the position that "[b]oth the Superior Court and Fawkes strictly and faithfully complied with this Court's Judgment and Mandate that Fawkes 'set aside the [first set] of nomination papers' of Senator Hansen." (Hansen Br. 1 (brackets in original).) However, neither this Court's August 28, 2014 opinion and order, nor the Superior Court's August 29, 2014 order, referred to a "first set of nomination papers." This Court's August 28, 2014 opinion "direct[ed] the Superior Court to grant Bryan's petition *and remove Hansen from the general election ballot." Bryan I*, 61 V.I. at 239 (emphasis added). Likewise, the Superior Court's August 29, 2014 order contained virtually identical language directing the Supervisor of Elections to remove Hansen's name from the ballot. Clearly, setting aside Hansen's nomination papers without removing her name from the general election ballot — a remedy specifically provided for in both orders — cannot be in compliance with the letter of either the August 28, 2014 opinion or the August 29, 2014 order.[28] And as Bryan correctly notes in his brief, Virgin Islands law expressly provides that nomination

---

[27] In addition, the District Court held that it interpreted sections 411 and 412 as providing Hansen with an automatic right to cure because "interpreting Sections 411 and 412 to prohibit Senator Hansen from curing would require an inherently difficult analysis of the underlying constitutional issues." *Payne II*, 2014 U.S. Dist. LEXIS 134451 at *45. We note that Hansen, while asserting constitutional issues in the *Payne* proceeding, never challenged the consti- tutionality of the cure provisions in the appellate briefs filed before this Court. As such, those claims are waived for purposes of this civil appeal. *V.I. Waste Mgmt. Auth. v. Bovoni Invs., LLC*, 61 V.I. 201, 224 (V.I. 2014) (citing V.I.S.Ct.R. 22(m)). However, while this Court has held that the doctrine of constitutional avoidance cautions against gratuitously deciding con- stitutional issues when a party may receive the same relief on non-constitutional grounds, *see Azille v. People*, 59 V.I. 215, 227 (V.I. 2012), this Court has never adopted the rule that the plain text of an unambiguous Virgin Islands statute be disregarded simply because of the possibility that, at some future date, someone may argue that the statute is unconstitutional.

[28] We recognize that Fawkes initially removed Hansen from the general election ballot, but then proceeded to place her back on the ballot two weeks later, without obtaining an order from either this Court or the Superior Court to modify the prior judgment directing Hansen's removal. However, it is so fundamental as to not require citation that such "compliance" with the orders of this Court and the Superior Court is illusory. *See New York State Labor Relations*

papers be filed with the Supervisor of Elections by the "second Tuesday in May by 6 p.m. of each general election year." 18 V.I.C. § 410(a)(2). To treat Hansen's "new" nomination papers as valid notwithstanding the clear filing deadline established in section 410 would essentially render the judicial review provisions of section 412 — a statute intended to safeguard the rights of the general public in cases where the Supervisor of Elections fails to correctly discharge her responsibilities under section 411, *see Moorhead v. Gov't of the V.I.*, 18 V.I. 237, 244 (V.I. Super. Ct. 1982) — a complete nullity, since an individual whose nomination papers were set aside could simply file a new set of nomination papers, even months after the fact. *See Huijers v. DeMarrais*, 11 Cal. App. 4th 676, 14 Cal. Rptr. 2d 232, 234 (1992) ("A statute without a remedy might as well be written in invisible ink.").[29]

### C. Enforcement of Local Court Orders

 Having determined that this Court's August 28, 2014 opinion and the Superior Court's August 29, 2014 order remain valid, we must now determine whether Bryan is entitled to have that order enforced. "The right to have a judgment enforced is not inherent in the judgment itself," but naturally must "come from other provisions of law," given that "[t]he judgment is itself a creation of law." *Stanford v. Coram*, 28 Mont. 288, 72 P. 655, 655 (1903). Under Virgin Islands law, a court possesses

---

*Bd. v. George B. Wheeler, Inc.*, 177 Misc. 945, 31 N.Y.S.2d 785, 787-88 (1941) (holding employer did not comply with order directing reinstatement of worker when employer put employee to work for an hour and a half and then told him there was no work, for purported compliance was "perfunctory and illusory").

[29] In her appellate brief, Hansen also argues that "this Court . . . limited her intervention rights to those rights asserted by Fawkes and did not grant her the status as a 'full party.' " (Hansen Br. 13.) This is patently incorrect. While this Court held that Hansen lacked standing to challenge Bryan's standing to bring a petition under section 412 because Fawkes had already waived that defense, we emphasized that standing — like the statute of limitations — was a defense personal to Fawkes, as the respondent in the proceeding, and that Hansen was thus precluded from raising such a defense on Fawkes's behalf when Fawkes had already declined to do so. *Bryan I*, 61 V.I. at 229. Other than the standing argument — which this Court nevertheless rejected on the merits, *see id.* at 222, n.12 — this Court did not decline to consider any defenses or arguments raised by Hansen in her appellate brief; on the contrary, even the most cursory review of the *Bryan I* opinion reveals that virtually all of the issues addressed in the opinion had been raised by Hansen alone.

the authority to enforce any of its lawful orders.[30] 4 V.I.C. §§ 243(4), 281. Given our holding that our August 28, 2014 opinion and the Superior Court's August 29, 2014 order remain in effect, in that they were never appealed to or reversed by the United States Supreme Court, never vacated by this Court, nor modified in any way, Bryan is clearly entitled to have that judgment enforced.[31]

We recognize, of course, that specific performance of the August 29, 2014 order is somewhat complicated by the fact that absentee ballots have been printed and early voting has begun, all of which include Hansen as a candidate for membership in the 31st Legislature. We further acknowledge that the United States Supreme Court has held that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964). Unquestionably, enforcing the August 29,

---

[30] Hansen argues that, because Bryan's motion cited to 5 V.I.C. § 1176 — respecting monetary judgments — and Superior Court Rule 111 — governing enforcement of judgments in the Family Division of the Superior Court — he lacks a good-faith basis to enforce the underlying judgment. However, as noted above, sections 243(4) and 281 of title 4 of the Virgin Islands Code provide the statutory authority for a party — or even the court acting *sua sponte* — to enforce a valid order. Because it is well-established that "the substance of a motion, and not its caption, shall determine under which rule that motion is construed," Bryan's citation to the incorrect statute or court rule, without more, cannot serve as a bar to him obtaining the relief he desires. *Anthony v. FirstBank Virgin Islands*, 58 V.I. 224, 228 n.5 (V.I. 2013) (quoting *Island Tile & Marble, LLC v. Bertrand*, 57 V.I. 596, 611-12 (V.I. 2012)).

[31] In her appellate brief, Hansen, relying on *Beachside Assocs., LLC v. Bayside Resort, Inc.*, No. 07-626, 2013 V.I. LEXIS 26, at *1 (V.I. Super. Ct. May 15, 2013) (unpublished), contends that "*this Court* has previously recognized" that "courts are called upon to decide actual cases and controversies" and that an individual may not bring a claim unless he "allege[s] that he himself suffers some 'injury in fact' by reason of the action sought to be challenged." (Hansen Br. 40 (emphasis added; internal quotation marks omitted).). However, we note that the *Beachside Assocs.* opinion she has cited is a decision of the *Superior* Court, not the *Supreme* Court. In fact, this Court has repudiated the position taken by the *Beachside Assocs.* court, and expressly held that the "cases and controversies" requirement of Article III is not jurisdictional as applied to Article IV courts such as this Court and the Superior Court. *Benjamin v. AIG Ins. Co. of P.R.*, 56 V.I. 558, 564 (V.I. 2012) (overruling all prior Virgin Islands case law characterizing standing, mootness, ripeness, and other doctrines stemming from Article III's cases and controversies requirement as jurisdictional as applied to Virgin Islands courts); *accord* 5 V.I.C. § 423 (expressly authorizing the Superior Court to issue an advisory opinion upon the application of the parties). In any event, this Court, in its opinion in *Bryan I*, already conclusively determined that Bryan has standing in this proceeding. 61 V.I. at 222 n.12 ("We would conclude that Bryan has unquestionably established standing.").

2014 order in a way that would render invalid absentee and early votes that have already been cast in favor of Hansen would violate the "fundamental political right" to vote. *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972) (internal quotation marks omitted). However, we are confident that the August 29, 2014 order directing Hansen's removal from the ballot can be enforced without denying or diluting the votes of any individuals who have already cast early or absentee votes for Hansen in reliance on her placement on the ballot. To give just one possibility, election officers may simply add any early and absentee votes cast for Hansen from ballots including Hansen's name as a candidate prior to her removal to any write-in votes cast for Hansen after the removal is effectuated, and calculate Hansen's vote count based on that cumulative total.[32]

We also do not believe that the rule announced by the United States Supreme Court in *Purcell v. Gonzalez*, 549 U.S. 1, 127 S. Ct. 5, 166 L. Ed. 2d 1 (2006), is applicable to this case. In *Purcell*, the United States Supreme Court held that a federal court of appeals erred in issuing an injunction significantly altering a state's election procedures "just weeks before an election." *Id.* at 4. Bryan has — at no point in these proceedings — sought injunctive relief; rather, he vindicated his rights under section 412 to have the validity of Hansen's nomination papers judicially reviewed, and now seeks to have the judgment entered in his favor enforced in the face of Fawkes's refusal to remove Hansen from the ballot. As such, *Purcell* and its progeny — all of which involve an analysis of the four factors courts consider in issuing an injunction — are not relevant to this appeal. *See State ex rel. Owens v. Brunner*, 125 Ohio St. 3d 130, 2010 Ohio 1374, 926 N.E.2d 617, 624-25 (2010) (directing election authorities to place candidate on ballot one month before primary

---

[32] In a section of her appellate brief titled "The rights of the Voters who are holding an actual Permanent Injunction cannot be compromised in this limited proceeding," (Hansen Br. 37), Hansen resurrects many of the arguments that the five voters had made in the District Court proceeding. We question whether Hansen has standing to bring forth arguments on behalf of these individuals when they have, for whatever reason, elected not to intervene in this proceeding. However, if Fawkes were to comply with the August 29, 2014 order by counting all early and absentee votes already cast in favor of Hansen together with any write-in votes she receives in the future, the rights of all individuals who have already cast their ballots will be fully safeguarded.

election, even after ballots have been printed and the election process began, notwithstanding dissent's reliance on the *Purcell* decision); *accord Blum v. Lanier*, 997 S.W.2d 259, 264 (Tex. 1999) (rejecting the argument that "starting the election mooted this appeal").

Moreover, we note that *Purcell* and similar cases, in addition to involving injunctions, did not involve challenges to a candidate's access to the ballot, but instead involved requests for courts to impose large-scale changes to the election process itself that affected both voters and poll workers. *See, e.g., Frank v. Walker*, 135 S. Ct. 7, 190 L. Ed. 2d 245 (2014) (vacating stay of injunction prohibiting state from implementing photo identification requirement when some votes had already been cast without requiring photo identification); *Purcell*, 549 U.S. at 2 (noting that injunction, if granted, would have barred enforcement of law, enacted two years earlier, requiring voters to present proper identification); *Veasey v. Perry*, 769 F.3d 890, 892, 896 (5th Cir. 2014) (staying trial court's decision to grant injunction enjoining implementation of existing voter identification requirement, which had already been used in three prior elections, when state introduced evidence that adopting new procedure nine days before voting begins would require it to "train 25,000 polling officials at 8,000 polling stations about the new requirements" imposed by the trial court). This case, however, does not involve a Territory-wide change in election practices, but only requires a change to the general election ballot in a single district within the Virgin Islands, the District of St. Croix. The fact that the general election ballot has been printed and that some voters have already cast early or absentee ballots does not, without more, prevent this Court from fashioning appropriate relief with respect to ballots that have not yet been cast. *See Steve ex rel. Davis v. Summit Cnty. Bd. of Elections*, 137 Ohio St. 3d 222, 2013 Ohio 4616, 998 N.E.2d 1093, 1095 (2013) (rejecting claim that general election ballot could not be changed to include wrongfully-omitted candidate simply because absentee voting had already begun 17 days before court issued opinion); *Blum*, 997 S.W.2d at 263-64 (holding court could impose judicial remedy that, going forward, would correct misleading language in ballot initiative, notwithstanding the fact that voting had already begun); *LaRouche v. Hannah*, 822 S.W.2d 632, 633 (Tex. 1992) (ordering election officials to place candidate's name on ballot despite the fact that absentee ballots without candidate's name were already printed); *Triantaphyllis v. Gamble*, 93 S.W.3d 398, 406-07 (Tex. App. 2002)

(discussing prior case in which Texas Supreme Court order required placement of candidate's name on ballot after in-person absentee voting already began) (citing *Correa v. First Court of Appeals*, 795 S.W.2d 704 (Tex. 1990)).

Moreover, the resolution of this case will have no impact on voters — as noted earlier, we are confident that those who already voted for Hansen will have their votes count, while those who have not yet voted could still vote for her as a write-in — or on elections personnel, who would not have to be trained to implement any new procedures. The sole cost incurred would be the costs associated with printing a new general election ballot, which, as we explain in greater detail below, cannot form a valid basis for declining to enforce the August 29, 2014 order, given that Fawkes's decision not to comply with the August 29, 2014 order is precisely the reason why those costs would need to be incurred in the first place.

The decision of the Minnesota Supreme Court in *Melendez v. O'Connor*, 654 N.W.2d 114 (Minn. 2002), supports our disposition. In that case, the Minnesota Supreme Court was asked, on October 2, 2002, to remove a candidate from the ballot for the November 5, 2002 general election on the grounds that he failed to satisfy a mandatory requirement that he reside in the legislative district to which he sought to represent. The Minnesota Supreme Court, in an order issued on October 15, 2002 — just three weeks before the general election — granted the petition, and ordered the candidate's name removed from the ballot. *Id.* at 117. In the subsequent opinion explaining the reasons for its decision, the Minnesota Supreme Court reasoned that equitable doctrines such as laches were irrelevant because "there would be no prejudice to [the candidate] or others in granting the relief requested" since the candidate was not entitled to have his name appear on the ballot due to his failure to comply with Minnesota law. *Id.* This result is consistent with how other courts have treated similar challenges relating to a candidate's placement on the ballot that were contested in the local judicial system in a timely manner. *Compare Abrams v. Lamone*, 394 Md. 304, 905 A.2d 840, 840 (2006), *opinion subsequently issued*, 398 Md. 146, 919 A.2d 1223 (2007) (ordering removal of candidate from ballot on August 25, 2006, in advance of election scheduled to be held in September 2006, when plaintiff timely initiated election protest in July 2006 with delay attributable solely to that inherent in the ordinary appellate process), *with*

*Liddy v. Lamone*, 398 Md. 233, 919 A.2d 1276, 1279 (2007) (declining to decertify winner of primary election and remove candidate from general election ballot when challenge is raised, for the very first time in any judicial proceeding, a mere 18 days before the general election); *see also Delgado v. Bd. of Election Comm'rs of City of Chicago*, 224 Ill. 2d 481, 865 N.E.2d 183, 189, 309 Ill. Dec. 820 (2010) (ordering removal of candidate from ballot four days prior to the scheduled election); *Parra v. Neal*, 614 F.3d 635, 637 (7th Cir. 2010), *cert. denied*, 562 U.S. 1137, 131 S. Ct. 914, 178 L. Ed. 2d 751 (2011) (holding, in a suit brought by voters after the *Delgado* decision, that the Illinois Supreme Court did not violate federal law when it ordered the ineligible candidate's removal from the ballot despite the proximity of the election); *Davis*, 998 N.E.2d at 1095 (ordering candidate added to ballot 17 days after absentee voting began and two weeks before election day).

 Likewise, we are not persuaded by Fawkes's claim that this Court should not order her to remove Hansen from the ballot given that ballots were already printed. While we agree that "the value of preserving the status quo [in an election case] is much higher than in most other contexts," *Veasey*, 769 F.3d at 892, Fawkes ignores the obvious fact that it is she — and not this Court — that has disturbed the status quo in this case. This Court, in its August 28, 2014 opinion, unambiguously ordered Fawkes to remove Hansen's name from the general election ballot, and the Superior Court did the same in its August 29, 2014 order. Despite this clear directive, Fawkes chose to keep Hansen's name on the general election ballot,[33] apparently based on a belief that consenting to issuance of a temporary restraining order or injunction in the District Court would render the August 28, 2014 opinion and August 29, 2014 order unenforceable, notwithstanding the fact that this Court's September 12, 2014 order should have made clear that this Court did not agree with the District Court's interpretation of sections 411 and 412, the sole basis upon which the temporary restraining order and injunction had been entered.

---

[33] In her brief, Fawkes notes that section 411(b) provides that "[i]f the Supervisor determines that a candidate for election or nomination does not meet the qualifications established by law for the office, then he shall disqualify such candidate and delete the candidate's name from the ballot if the ballots have not been printed," implying that this provision should serve as a bar to this Court ordering that the general election ballot be reprinted to remove Hansen's name. As we explained in considerable detail above, section 411 has absolutely no relevance when a judicial proceeding has been instituted under section 412, as is the case here.

471

Significantly, the recent *Veasey* court itself observed that "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Id.* at 895 (quoting *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013)).

Permitting Hansen's name to appear on the general election ballot, notwithstanding the fact that it is not entitled to be there, would in effect nullify section 412 — a statute enacted to protect the public in precisely a situation such as this, where the Supervisor of Elections accepts nomination papers that, under Virgin Islands law, should not have been accepted — and it would reward both Fawkes and Hansen by granting them *de facto* relief from the August 28, 2014 opinion, the August 29, 2014 order, and the September 12, 2014 order not because they were incorrectly decided, but simply because Fawkes was able to successfully evade compliance and avoid the review of this Court until two weeks before the election. A decision from the territory of Guam supports this holding. *Guam Election Comm'n v. Responsible Choices for All Adults Coalition*, 2007 Guam 20 (Guam 2007). In that case, the Guam Election Commission had placed a ballot initiative on the November 2006 general election ballot that would have raised the legal age for purchasing and possessing alcohol, but failed to comply with numerous Guam statutes and regulations, ultimately resulting in a protester filing a petition for writ of mandamus with the Guam Superior Court on October 12, 2006. *Id.* at ¶¶ 16-17. Ultimately, the Guam Superior Court granted the mandamus petition on October 25, 2006 — one week before the election, and after absentee voting had already begun — and ordered the Guam Election Commission to either remove the initiative from the ballot or not certify the results. *Id.* at ¶ 20. On appeal, the Guam Supreme Court affirmed the Guam Superior Court's decision, and expressly held that the Guam Superior Court correctly held that the Guam Election Commission could not rely upon laches and similar equitable doctrines to defeat judicial review, notwithstanding the close proximity to the election, since the protester "acted diligently" to preserve its rights before the election and the delay in the matter being considered by the Guam judiciary was attributable entirely to the Guam Election Commission's repeated failure to comply with Guam law. *Id.* at ¶¶ 81-83.

While not determinative in our decision to order Fawkes to remove Hansen's name from the general election ballot, we also note that

Fawkes has made absolutely no representations to this Court or the Superior Court — let alone submitted any actual evidence — that would cause this Court to believe that printing new general election ballots would pose a hardship. This Court, as an appellate court, may not issue a decision based on speculation, "but rather must consider the evidence of record and base its decisions on facts in the record."[34] *Cross v. Kansas Dept. of Revenue*, 279 Kan. 501, 110 P.3d 438, 446 (2005); *Akins v. Tedder*, No. 87-227-II, 1988 Tenn. App. LEXIS 648, *4 (Tenn. Ct. App. 1988) (unpublished) ("[T]he Court of Appeals has appellate jurisdiction only. We may not properly base our decisions on evidence neither considered by the trial court nor contained in the record on appeal."). Under Virgin Islands law, Bryan is not required to prove a negative; rather, it is Fawkes who bears the burden of affirmatively showing, based on admissible evidence, that enforcing the terms of the August 29, 2014 order at this stage would be financially or logistically difficult. 5 V.I.C. § 740(5) ("In civil cases the affirmative of the issue shall be proved.").

In this case, the Superior Court held a hearing on October 7, 2014, and even provided the parties with an opportunity to submit "anything in writing" by the close of business on October 8, 2014 (Hr'g Tr. 67), yet Fawkes failed to come forward with any evidence whatsoever to support a claim that she cannot order the reprinting of the general election ballot. Moreover, we note that Hansen is a candidate for the 31st Legislature from the District of St. Croix, and thus only the St. Croix general election ballot will need to be reprinted, rather than the general election ballot for the entire Territory. Additionally, we cannot ignore that, under Virgin Islands law, the Supervisor of Elections must use electronic voting machines, *see* 18 V.I.C. §§ 501, 521-24, and thus any cost in changing the ballot will likely be lower than in years past, given that the ballot may be changed simply by reprogramming a voting machine. And to the extent new paper ballots may not be printed in a sufficient time, other potential remedies exist to enforce the August 29, 2014 order, such as covering

---

[34] In fact, we note that the state governments in *Purcell* and similar cases did not request that the United States Supreme Court and pertinent federal courts of appeal engage in pure speculation, but came forward with actual evidence demonstrating that changing the election procedures at such a late date would result in actual harm. *See, e.g., Veasey*, 769 F.3d at 896 (noting that allowing federal district court's injunction to go into effect would require the state to "train 25,000 polling officials at 8,000 polling stations about the new requirements" imposed by the trial court).

Hansen's name with an adhesive sticker. See *Lamone v. Capozzi*, 396 Md. 53, 912 A.2d 674, 679 (2006). For all of the reasons discussed above, we reverse the portion of the Superior Court's October 10, 2014 order that denied Bryan's motion to enforce the August 29, 2014 order, and we hereby order Fawkes to immediately recall all ballots with Hansen's name and replace them with ballots omitting her as a candidate, or to otherwise remove Hansen's name from the ballot, such as by covering her name with an adhesive sticker.

## D. Sanctions

█ Finally, we turn to Bryan's request that the Superior Court, in addition to enforcing its August 29, 2014 order, hold Fawkes in contempt for her non-compliance or otherwise impose sanctions. It is well-established that the Superior Court's decision to impose, or decline to impose, a sanction — including the ultimate sanction of contempt — is typically reviewed only for abuse of discretion. *In re Rogers*, 56 V.I. 325, 334 (V.I. 2012) (citing *In re Najawicz*, 52 V.I. 311, 328 (V.I. 2009)). However, when the decision to hold — or in this case, not hold — an individual in contempt is based on the Superior Court's error of law, we review the issue *de novo. In re Drue*, 57 V.I. 517, 522 (V.I. 2012) (citing *Rogers*, 56 V.I. at 334)).

█ Courts have not spoken with a single voice as to whether the issuance of two conflicting orders by two separate courts, in which one court's order cannot be followed without violating the other court's order, serves as a valid defense to the imposition of sanctions, whether for contempt or otherwise. *Compare In re Cornyn*, 27 S.W.3d 327, 338 (Tex. App. 2000) (Cohen, J., concurring) ("It is intolerable for two courts with the same jurisdiction to exercise judicial power simultaneously over the same property, enter conflicting orders, and enforce them by contempt."), *and In re William T.*, 172 Cal. App. 3d 790, 218 Cal. Rptr. 420, 425-26 (1985) ("[C]oncurrent jurisdiction does not make the jurisdiction coequal. . . . Such conflicting orders are void and a party may not be held in contempt for disobeying such orders."), *with Chairs v. Burgess*, 143 F.3d 1432, 1438 (11th Cir. 1998) ("We stress, however, that merely being subject to different court orders constitutes no defense to contempt. Despite the presence of conflicting orders from other courts, a district court can correctly conclude, after studying all the circumstances, that a party has failed to act reasonably to comply with the terms of its decree.").

But even if we were to assume — without deciding — that the presence of two court orders which are in irreconcilable conflict would ordinarily constitute a defense to being sanctioned for violating the valid order, we cannot extend such a rule to a case in which the second order was procured through fraud or collusion. *See, e.g., Motorola Credit Corp. v. Uzan*, No. 02 CIV. 666 (JSR), 2002 U.S. Dist. LEXIS 15650, *12 (S.D.N.Y. Aug. 22, 2002) (unpublished) (holding party in civil contempt, despite conflicting injunctions issued by Turkish court, "because, on inspection, it is apparent that [the injunctions] are in substantial measure the product of collusion between the plaintiff-distributors and the defendants").

In the portion of his motion requesting imposition of sanctions, Bryan alleged that Fawkes and Hansen colluded to obtain the District Court temporary restraining order and permanent injunction in order to frustrate the ability of this Court and the Superior Court to enforce our otherwise-valid August 28, 2014 opinion and August 29, 2014 order. Specifically, Bryan alleged in his motion that Fawkes — despite having numerous defenses available to her, both as to jurisdiction and the merits — chose to "do[] **nothing** to defend herself in the District Court action," electing to "not even lodge as a basic defense the valid court orders from the Supreme and Superior Courts," and instead "proffer[] the identical arguments given by Hansen and the other Plaintiffs." (Mot. 11 (emphasis in original).) To bolster his claim of collusion, Bryan notes that Fawkes and Hansen were co-appellees in the *Bryan I* proceeding and took substantially the same position on the merits, and further notes that Fawkes accepted representation from the Virgin Islands Attorney General, which he implies may have constituted a conflict of interest given that it is the Attorney General who advised the Governor as to the legal effect of Hansen's pardon and issued the advisory opinion, relied upon by Hansen, that section 411 provided her with an automatic right to cure. (*Id.* at 10.) Even the District Court acknowledged, in its *Bryan III* opinion, the possibility that the Superior Court could hold Fawkes in contempt if Bryan established that Fawkes failed to mount a credible defense in violation of local law. 2014 U.S. Dist. LEXIS 139025 at *12.

 Despite Bryan having brought these issues directly before it, the Superior Court failed to make any factual findings or issue any conclusions of law based on the collusion claim; in fact, the October 10,

2014 order makes no mention of Bryan's collusion argument at all.[35] As this Court has previously emphasized, a court can never exercise its discretion to simply ignore a claim that a party has brought squarely before it. *Garcia v. Garcia*, 59 V.I. 758, 771 (V.I. 2013); *see also Austin-Casares v. Safeco Ins. Co. of America*, 310 Conn. 640, 81 A.3d 200, 208 n.11 (2013) ("[A] trial court abuses its discretion when it fails to exercise its discretion.") (collecting cases). When a party brings a non-frivolous claim that another party should be held in contempt for deliberately circumventing a court order by obtaining a conflicting court order in another jurisdiction, an evidentiary hearing is ordinarily necessary to develop a factual record. *Debaron Associates v. Van Slooten*, No. L-34-10, 2014 N.J. Super. Unpub. LEXIS 148, *14 (N.J. Super. Ct. App. Div. Jan. 23, 2014) (unpublished) (holding that trial court erred in adjudicating costs and attorneys fee motion, predicated on claim that party circumvented New Jersey order by obtaining conflicting order from a New York court, without holding an evidentiary hearing). However, even if it believes that an evidentiary hearing is not required, the Superior Court must, at an absolute minimum, issue a ruling and explain its decision so that it may be effectively reviewed by this Court on appeal. *See In re Q.G.*, 60 V.I. 654, 664 (V.I. 2014) ("[M]eaningful appellate review is impossible where the Superior Court fails to explain the reasons for its actions."); *Rieara v. People*, 57 V.I. 659, 668 (V.I. 2012) ("Meaningful review is not possible where the trial court fails to sufficiently explain its reasoning."). Thus we vacate the portion of the October 10, 2014 order denying Bryan's request for sanctions, and order the Superior Court, on remand, to address Bryan's collusion claim on the merits and issue findings of fact and conclusions of law.

## IV. CONCLUSION

For the foregoing reasons, we reverse the Superior Court's October 10, 2014 order, again order Fawkes to remove Hansen's name from the general election ballot for the November 4, 2014 general election, and remand the case to the Superior Court to make the factual findings and

---

[35] Although there was a suggestion at the October 7, 2014 hearing that Bryan may have withdrawn his contempt charge, Bryan's counsel, when pressed by the trial judge, unambiguously stated that he wanted to "make it clear, since everybody else seems to be confused," that he was "not abandoning" his contempt claim. (Hr'g Tr. 25.)

legal conclusions necessary to determine whether Fawkes should be held in contempt or otherwise sanctioned for her non-compliance with the orders of this Court and the Superior Court.

In so holding, we recognize that this decision will not be without controversy; for instance, we note that Hansen's counsel told the Superior Court judge, at the October 7, 2014 hearing, that declining to follow the District Court orders "would get you a ticket to the Supreme Court faster than your head could spin. Not the V.I. Supreme Court, the U.S. Supreme Court." (Hr'g Tr. 52.) This Court recognizes that, as a result of the passage of Public Law 112-226, the United States Supreme Court is "the final arbiter" of any conflict between this Court and the District Court. *Delaware Valley Citizens' Council for Clean Air*, 755 F.2d at 43. We acknowledge that we are not infallible; if the United States Supreme Court were to ultimately conclude that this Court is mistaken as to any aspect of its interpretation of federal law — including the relationship between this Court and the District Court — we will abide by that decision without question, just as other courts of last resort have done in the past. *See, e.g., Puget Sound Gillnetters Ass'n v. Moos*, 92 Wn.2d 939, 603 P.2d 819, 825 (1979) (modifying precedent to conform with United States Supreme Court's ruling in case where it resolved a disagreement between the Washington Supreme Court and a lower federal court in favor of the lower federal court). Until such a day comes, the Justices of this Court — like all judges, whether sitting on federal, state, territorial, or tribal courts — will continue to "uphold and apply the law" in the cases before us to the best of our ability. AM. BAR ASS'N MODEL CODE OF JUD. CONDUCT, Canon 2, R. 2.2.

CABRET, *Associate Justice*, concurring in part and dissenting in part.

I join the majority opinion in full except for the section addressing the enforcement of this Court's and the Superior Court's orders. The majority presents the specific performance of these orders as the only result it can reach, framing this issue only in terms of Bryan's right to have those orders enforced. But whether a court will require specific performance of its orders in a contempt proceeding is ultimately a matter of discretion. *See Delaware Valley Citizens' Council for Clean Air v. Com. of Pa.*, 678 F.2d 470, 478 (3d Cir. 1982) (a court has "wide discretion in fashioning a remedy" for civil contempt). And while the majority has exercised this discretion by again ordering that Hansen's name be removed from the ballot, I would decline to do so at this late date. "No right is more precious

in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live," *Reynolds v. Sims*, 377 U.S. 533, 560, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964), and despite Bryan's interest in seeing that the orders granting his petition are enforced — or the interest this Court has in ensuring compliance with its orders — it is not worth risking that even one person lose that voice.

Ballots have been printed that include Hansen's name, and hundreds of votes have already been cast since early voting began on Tuesday.[1] "Where voting has begun, . . . the rights of the voters to an accurate, reliable ballot must override [the] right to challenge [a candidate's] insufficient application for a place on that ballot." *Bejarano v. Hunter*, 899 S.W.2d 346, 352 (Tex. App. 1995). This is because "[t]o disenfranchise a single voter is a matter for grave concern," *Service Employees Int'l Union, Local 1 v. Husted*, 906 F. Supp. 2d 745, 750 (S.D. Ohio 2012), and even though the majority is "confident" that those who have already cast their ballots for Hansen will not be disenfranchised by today's decision, there is no way of knowing how these votes will be counted or if they will be counted at all. But more significantly, there is no way of knowing whether the ongoing early voting — the first early voting in Virgin Islands history — can even continue now that this Court has entered an order requiring the ballots to be altered. *See Williams v. Rhodes*, 393 U.S. 23, 35, 89 S. Ct. 5, 21 L. Ed. 2d 24 (1968) ("Certainly at this late date it would be extremely difficult, if not impossible, for [election officials] to provide still another set of ballots. Moreover, the confusion that would attend such a last-minute change poses a risk of interference with the rights of other . . . citizens."). Although the majority believes that removing Hansen's name from the ballot at this point is a simple matter, that conclusion is based entirely on speculation, as there is nothing in the record regarding the time and money required to make this change, nor regarding the difficulty in implementing this Court's order while voting is ongoing.

The District Court's orders — as incorrect as they were — have been complied with by election officials since September 12. Whether we like

---

[1] Aldeth Lewin, *First day of early voting nets hundreds of ballots*, THE VIRGIN ISLANDS DAILY NEWS, Oct. 22, 2014, at 2; Ernice Gilbert, *Over 160 cast their ballots on first day of early voting on St. Croix*, V.I. CONSORTIUM (Oct. 22, 2014), http://viconsortium.com/poli tics/over-160-people-cast-their-ballots-on-first-day-of-early-voting-in-st-croix/, *archived at* http://perma.cc/Z4XD-D74Q.

it or not, that is the status quo, and "where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief." *Reynolds*, 377 U.S. at 585. These equitable considerations and the uncertain consequences of disregarding them cautions strongly against upending that status quo a mere 10 days before Election Day, as this Court is ill equipped to anticipate the complications of implementing the required changes on such short notice. And there is no question that ordering Hansen to again be removed from the ballot will only add to the confusion of voters who have already seen Hansen placed on the ballot by the Supervisor of Elections, taken off by this Court, put back on by the District Court, and now taken off once again by this Court. *See Liddy v. Lamone*, 398 Md. 233, 919 A.2d 1276, 1290 (2007) (declining to remove an unqualified candidate from the ballot when "[t]he confusion that would have resulted from such last-minute changes would have, indubitably, interfered with the rights of . . . voters . . . causing them to be disenfranchised").

As the United States Supreme Court has cautioned, "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5, 127 S. Ct. 5, 166 L. Ed. 2d 1 (2006). That risk is substantial here and the majority's attempt to distinguish away the relevance of *Purcell* based only on its procedural posture elevates form over substance, something this Court has repeatedly cautioned against. *See, e.g., In re People of the V.I.*, 51 V.I. 374, 383-84 (V.I. 2009). So even though a month ago I would have joined the majority in again ordering that Hansen be removed from the ballot, I cannot do so now at the risk of disenfranchising those voters who have already cast a ballot for Hansen. *Cf. Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) ("The decision to enjoin an impending election is so serious that the Supreme Court has allowed elections to go forward even in the face of an undisputed constitutional violation.") (collecting cases). Therefore, because I cannot agree that upending the status quo just as voters begin to cast their ballots is the appropriate remedy for the failure of the Supervisor of Elections to comply with this Court's August 28 order and the Superior Court's August 29 order, I respectfully dissent.